# EXHIBIT A



MANAGEMENT LIABILITY SOLUTIONS

NOTICE:
THIS IS A CLAIMS MADE POLICY AND, SUBJECT TO ITS PROVISIONS, APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. CLAIMS MUST BE REPORTED TO THE COMPANY IN ACCORDANCE WITH SECTION VI. DEFENSE COSTS ARE WITHIN THE LIMIT OF LIABILITY. PLEASE REVIEW THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

Terms in bold face type have the special meaning. See the definitions sections of this Policy.

| NAMED INSURED AND ADDRESS | PRODUCER |
|---|---|
| Item 1. Joy Global Inc.<br>100 East Wisconsin Avenue<br>Milwaukee, WI 53202<br>Attn: Sean Major | MARSH USA INC<br>Jessica Levins<br>540 W MADISON, STE. 1200<br>CHICAGO, IL 060661 |
| CUSTOMER NUMBER | INSURER |
| 203192 | Columbia Casualty Company<br>CNA Plaza<br>Chicago, Illinois 60685-0001 |
| POLICY NUMBER | |
| 287049801 | |

Item 2. Policy Period: 7/31/2016 to 7/31/2017

    12:01 a.m. local time at the address stated in Item 1.

Item 3. Policy Premium $236,250.00

Item 4. Notices to Insurer:

    Claims:
    CNA – Claims Reporting
    P. O. Box 8317
    Chicago, IL 60680-8317
    Email Address: SpecialtyNewLoss@cna.com
    Fax Number: 866-773-7504

    All other notices:
    CNA Specialty Lines
    333 S. Wabash Ave, 40S
    Chicago, IL 60604

    Attn: David S. Lim

Item 5. Extended Reporting Period:
    a. Period: 1 Year at 150%
                 3 Years at 175%
                 6 Years at 200%

    b. Premium: 150% of Policy Premium

Item 6. Limit of Liability (Inclusive of Defense Costs):
    a. $10,000,000 aggregate limit of liability
    b. $500,000 aggregate sub-limit of liability applicable to Insuring Agreement 4.
    c. $250,000 Corporate Homicide Investigative Costs Sublimit

GSL41379XX (Ed.08-2016)
Page 1

© CNA All Rights Reserved.

---



MANAGEMENT LIABILITY SOLUTIONS

Item 7 Retentions:
    a. Retention applicable to Insuring Agreement 1: Each Claim - $0
    b. Retention applicable to Insuring Agreement 2 and 3: -
        • Each Political Action Claim - $50,000
        • Each Claim against Joy Global Foundation and it's Insured Persons - $50,000
        • Each Claim not described above - $1,500,000

Item 8. Prior or Pending Date: 07/12/2001

Item 9. Endorsements forming a part of this Policy at issuance:

| | | |
|---|---|---|
| GSL-7132-XX | 06/2010 | Trade And Economic Sanctions Endorsement |
| CNA-74300-XX | 06/2014 | Service of Suit |
| CNA-87129-XX | 09/2016 | JOY GLOBAL INC. RUN OFF PERIOD ENDORSEMENT |
| GSL-3842-XX | 01/2008 | Coverage And Cap On Losses From Certified Acts of Terrorism |

These Declarations, along with the completed and signed Application, the Policy, and any written endorsements attached shall constitute the contract between the Insureds and the Insurer."

Authorized Representative:

By: _____

Date: 10/31/2016

GSL41379XX (Ed.08-2016)
Page 2

© CNA All Rights Reserved.

Case 2:18-cv-02034-LA  Filed 12/28/18  Page 2 of 15  Document 1-1

EXHIBIT A



THIS POLICY APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. CLAIMS MUST BE REPORTED TO THE COMPANY IN ACCORDANCE WITH SECTION VI. DEFENSE COSTS ARE WITHIN THE LIMITS OF LIABILITY.

PLEASE REVIEW THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

Terms in bold face type have special meaning. See the definitions sections of this Policy.

The Insurer and the **Insureds** agree as follows, in consideration of the payment of the premium and in reliance upon all statements made in the **Application** furnished to the Insurer designated in the Declarations, a stock insurance corporation, hereafter called the "Insurer."

## I. INSURING AGREEMENTS

1. **Management Liability (Individual)**

   The Insurer shall pay on behalf of the **Insured Persons** that **Loss** resulting from any **Claim** first made against them during the **Policy Period** or the Extended Reporting Period, if applicable, for a **Wrongful Act**, except and to the extent that the **Insured Entity** has indemnified them for such **Loss**.

2. **Management Liability (Reimbursement)**

   The Insurer shall pay on behalf of the **Insured Entity** that **Loss** for which the **Insured Entity** has indemnified the **Insured Persons** and which results from any **Claim** first made against the **Insured Persons** during the **Policy Period** or the Extended Reporting Period, if applicable, for a **Wrongful Act**.

3. **Insured Entity Securities Liability**

   The Insurer shall pay on behalf of the **Insured Entity** that **Loss** resulting from any **Securities Claim** first made against the **Insured Entity** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act**.

4. **Shareholder Derivative Demand Investigation Costs and Books and Records Costs**

   The Insurer shall pay on behalf of the **Insured Entity**: (i) all **Shareholder Derivative Demand Investigation Costs** resulting from any **Shareholder Derivative Demand** first made during the **Policy Period** or the Extended Reporting Period, if applicable, for a **Wrongful Act**, and (ii) all **Books and Records Costs** resulting from a **Books and Records Demand** first made during the **Policy Period** or the Extended Reporting Period, if applicable.

5. **Corporate Manslaughter Defense Costs**

   The Insurer shall pay **Corporate Manslaughter Act Defense Costs** on behalf of an **Insured Person** resulting from any **Claim** first made against the **Insured Entity** during the **Policy Period** or the Extended Reporting Period, if applicable, for any **Corporate Manslaughter Wrongful Act**. Payment of any such **Corporate Manslaughter Defense Costs** are included within and erode the applicable Insuring Agreement I.1 or Insuring Agreement I.2 Limits of Liability.

©CNA All Rights Reserved.



JOY GLOBAL INC.
MANAGEMENT LIABILITY SOLUTIONS

## II. DEFINITIONS

**Application** means all signed applications, any attachments to such applications, other written materials submitted therewith or incorporated therein, and any other documents submitted in connection with the underwriting of this Policy by the Insurer. **Application** also means any Securities and Exchange Commission filings filed by the **Insured Entity** within the twelve month period immediately prior to the inception of this Policy.

**Books and Records Costs** means reasonable costs and expenses incurred by the **Insured Entity** in connection with all **Books and Records Demands**, but does not include salaries, wages, fees, overhead or benefit expenses associated with the directors, officers or employees of the **Insured Entity**.

**Books and Records Demand** means a written demand by or on behalf of any shareholder of the **Insured Entity** to inspect the books and records of such **Insured Entity** pursuant to Section 220 of the Delaware General Corporation Law or any similar statute in any other jurisdiction.

**Claim** means:

1. any written demand for monetary damages or non-monetary relief (including a request to toll the statute of limitations or for injunctive or declaratory relief) which **Claim** shall be deemed first made upon the **Insured's** receipt of notice of such demand;

2. any civil, criminal, administrative or regulatory proceeding (other than an investigation) or arbitration, mediation or any alternative dispute resolution proceeding, which **Claim** shall be deemed first made upon the date of service upon or other receipt by an **Insured** of a complaint or similar pleading in any such proceeding, or on the date of the return of an indictment, information or similar document against an **Insured** in any such criminal proceeding;

3. any civil, criminal, administrative or regulatory investigation of an **Insured Person**, which **Claim** shall be deemed first made upon such **Insured Person** being identified by name in an order of investigation, subpoena, Wells Notice or target letter (within the meaning of Title 9, §11.151 of the United States Attorney's Manual), as someone against whom a civil, criminal, administrative or regulatory proceeding may be brought;

4. solely with respect to Insuring Agreement 4., any **Shareholder Derivative Demand**, or **Books and Records Demand**;

5. any **Extradition**, which **Extradition** shall be deemed first made:

   a. upon receipt of an official request for or order of **Extradition** of an **Insured Person**;

   b. upon the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**, or,

6. any arrest and detainment or incarceration for more than 24 hours of an **Insured Person** by any law enforcement authority in a **Foreign Jurisdiction**;

alleging a **Wrongful Act**, including any appeal therefrom.

**Claim** shall also include an **Inquiry**, provided that an **Inquiry** shall only be deemed a **Claim** if the **Insureds**, in their sole option, give notice of such **Inquiry** to the Insurer. A **Claim** that is an **Inquiry** shall be deemed first made when it is first given to the Insurer, but coverage for **Loss** resulting from such **Inquiry** shall apply only to **Loss**

©CNA All Rights Reserved.

Case 2:18-cv-02034-LA   Filed 12/28/18   Page 3 of 15   Document 1-1



incurred after the Insurer first receives notice of such **Inquiry**. An **Inquiry** shall not require an actual or alleged **Wrongful Act** by the **Insured Person** in order to constitute a **Claim**.

**Clean Up Costs** means any expenses, including but not limited to legal and professional fees, incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants.**

**Common Law Country** means any country in which governing principles of law are derived from judicial decisions as in the Anglo-Saxon tradition. Such countries include, but are not limited to, the United States of America, Canada, United Kingdom, Republic of Ireland, Australia and New Zealand, and any state, territory, possession or political subdivision thereof.

**Corporate Manslaughter Act Defense Costs** means reasonable amounts incurred by an **Insured Person** that result from the investigation, adjustment, defense or appeal of a **Claim** against an **Insured Entity** for violation of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007 or any similar statute or law in any jurisdiction.

**Corporate Manslaughter Wrongful Act** means any error, misstatement, misleading statement, act, omission, neglect or breach of duty committed or attempted by the **Insured Entity** that is an actual or alleged violation of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007 or any similar statute or law in any jurisdiction.

**Defense Costs** means reasonable fees, costs, expenses and **SOX 304/Dodd-Frank 954 Costs**. consented to by the Insurer (such consent not to be unreasonably withheld or delayed) and incurred by the **Insureds** in the investigation, adjustment, defense or appeal of any covered **Claim** or incurred at the Insurer's request to assist the Insurer in investigating any covered **Claim**, and includes (i) premium for appeal bonds, attachment bonds or similar bonds arising out of a covered judgment, and (ii) such fees, costs and expenses incurred by the **Insured Entity** in seeking a dismissal of a **Shareholder Derivative Suit**. The Insurer has no obligation to provide such bonds. **Defense Costs** shall not include salaries, wages, fees, overhead or benefit expenses associated with the directors, officers, and employees of the **Insured Entity** or any **Inquiry Costs, Shareholder Derivative Demand Investigation Costs** or **Books and Records Costs**. Solely with respect to Insuring Agreement I. 5. **Defense Costs** also includes any **Corporate Manslaughter Act Defense Costs.**

Solely with respect to an **Extradition, Defense Costs** shall include **Extradition Costs**.

**Domestic Partner** means any person qualifying as such under any federal, state or local laws or under the employee benefit plans or other formal programs established by the **Insured Entity**.

**Employee** means any past, present or future full-time, part-time, seasonal or temporary employee of the **Insured Entity. Employee** does not include any **Executive**.

**ERISA or any Similar Act** means the Employee Retirement Income Security Act of 1974, as amended, or any similar common or statutory law of the United States, Canada or their states, territories or provinces or any other jurisdiction anywhere in the world.

**Employment Practices Claim** means a **Claim** alleging any **Wrongful Employment Practice.**

**Executive** means any past, present or future:

1. duly elected or appointed director, officer, trustee or governor, of a corporation, or a **Manager** of a joint venture, limited liability company or partnership;
2. official in an **Insured Entity** organized and operated in a **Foreign Jurisdiction** who is holding a position that is equivalent to an executive position listed in 1.;

©CNA All Rights Reserved.



3. in-house general counsel, risk manager, corporate comptroller, chief information security officer, investor relations director, corporate communications director and human resources director (or equivalent position) of the **Named Insured**; or
4. natural person shadow director, de facto director or prospective director so long as the **Insured Entity** has agreed to indemnify such director to the same extent it indemnifies duly elected or appointed directors and officers.

Solely with respect to a **Political Action Wrongful Act**, **Executive** means any person listed in 1. 2. 3. above, serving on a **Political Action Committee.**

**Extradition** means a process by which one country surrenders or is requested to surrender an **Insured Person** to another country for prosecution, incarceration or to answer any criminal accusation where an **Insured Person** is the subject of:

1. an official request for an order of **Extradition**; or
2. a warrant for arrest where such warrant is an element of **Extradition**.

**Extradition Costs** means reasonable fees, costs and expenses incurred in connection with a **Claim** against an **Insured Person** that are consented to by the Insurer (such consent not to be unreasonably withheld or delayed) to challenge, resist or defend against any request for or order of **Extradition**, or any appeal of any order of **Extradition**.

**Financial Insolvency** means, with respect to the **Insured Entity**:

1. the appointment of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate such **Insured Entity**; or such **Insured Entity** becoming a debtor in possession; and
2. the inability of such **Insured Entity** financially or under applicable law to advance **Defense Costs** or indemnify the **Insured Persons** for **Loss**.

**Foreign Jurisdiction** means any jurisdiction, other than the United States or any of its territories or possessions.

**Foreign Policy** means the standard executive managerial liability policy (including all mandatory endorsements, if any) approved by the Insurer or any of its affiliates to be sold within a **Foreign Jurisdiction** that provides coverage substantially similar to the coverage afforded under this Policy. If more than one such policy exists, then "**Foreign Policy**" means the standard basic policy form most recently offered for sale for comparable risks by the Insurer or any of its affiliates in that **Foreign Jurisdiction**. The term "**Foreign Policy**" shall not include any partnership, pension trust or professional liability coverage.

**Inadequate Consideration Claim** means that part of any **Claim** alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate.

**Inquiry** means any:

1. request for an **Insured Person** to appear at a meeting, hearing or interview, to produce documents, or, to be deposed, regarding either the business of an **Insured Entity** or such **Insured Person's** insured capacities if such request is:

    a. made by any **Regulatory Authority**; or

©CNA All Rights Reserved

Case 2:18-cv-02034-LA   Filed 12/28/18   Page 4 of 15   Document 1-1



b.  made by or on behalf of an **Insured Entity**, by its board of directors (or the equivalent management body) or any committee of the board of directors (or the equivalent management body) as part of its **Shareholder Derivative Demand Investigation** or in connection with an investigation by a **Regulatory Authority** concerning the business of that **Insured Entity** or that **Insured Person's** insured capacities; or

2.  arrest or involuntary confinement of an **Executive** of an **Insured Entity** by or on behalf of any **Regulatory Authority**, if such arrest or confinement is not otherwise included within the definition of **Claim** above and is in connection with the business of any **Insured Entity** or is in such **Executive's** capacity as such.

However, **Inquiry** shall not include any routine or regularly scheduled regulatory or internal supervision, inspection, compliance, review, examination, production or audit, including any request for mandatory information from a regulated entity, conducted in an **Insured Entity's** or **Regulatory Authority's** normal review or compliance process.

**Inquiry Costs** means the reasonable fees, costs and expenses consented to by the Insurer (such consent not to be unreasonably withheld or delayed) and incurred by an **Insured Person** solely in connection with their preparation for and response to an **Inquiry**. **Inquiry Costs** include the costs of complying with any formal or informal discovery or other request seeking documents, records or electronic information solely to the extent that they are in the possession or control of the **Insured Person**.

**Insured** means the **Insured Person** and **Insured Entity**.

**Insured Entity** means the **Named Insured** and any **Subsidiary** including any such entity as a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country. With respect to a **Political Action Wrongful Act**, **Insured Entity** also means a **Political Action Committee**.

**Insured Person** means any:

1.  **Executive** of an **Insured Entity**;
2.  **Employee** of an **Insured Entity**; or
3.  **Outside Entity Executive.**

**Interrelated Wrongful Acts** means any **Wrongful Acts** which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event.

**Loss** means those amounts that the **Insured Persons** (or the **Insured Entity** with respect to Insuring Agreements 3., 4. and 5.) are legally liable to pay as awards, settlements or judgments (including any award of pre-judgment and post-judgment interest on a covered judgment) and **Defense Costs**, **Inquiry Costs**, **Shareholder Derivative Demand Investigation Costs** and **Books and Records Costs**. Notwithstanding anything to the contrary in this definition below, **Loss** shall include (subject always to this Policy's other terms, conditions and limitations):

1.  punitive and exemplary damages and the multiple portion of any multiplied award;

2.  awards, settlements or judgments for which an **Insured** is liable pursuant to Section 11, 12 or 15 of the Securities Act of 1933, as amended; or

3.  awards, settlements or judgments in connection with an **Inadequate Consideration Claim** for which an **Insured Person** is liable pursuant to Section I, INSURING AGREEMENTS, paragraph 1, Management Liability (Individual).



Enforceability of subparagraphs 1, 2, and 3 above, shall be governed by such applicable law that most favors coverage for **Loss**.

However, **Loss** (other than **Defense Costs**) shall not include:

i.  fines or penalties imposed by law other than fines or penalties assessed against any **Insured Person**:

  a.  pursuant to the Foreign Corrupt Practices Act, 15 U.S.C. Sec. 78dd-2(g)(2)(B);
  b.  by the Securities and Exchange Commission, the Department of Justice, the Department of the Treasury or any comparable state regulatory authority for unintentional violations of law; or,
  c.  as described in Section 308 of the Sarbanes-Oxley Act of 2002.

  Provided the enforceability of coverage for such fines and penalties shall be governed by such applicable law that most favors coverage for such fines and penalties;

ii. taxes imposed by law other than taxes:

  a.  owed by the **Insured Entity** and assessed against any **Insured Person** due to insolvency of the **Insured Entity**; and,
  b.  solely with respect to Insuring Agreement I. 1., imposed upon an **Insured Person** solely by reason of the Insurer's payment of **Loss** incurred by such **Insured Person**;

  Provided that the enforceability of coverage for such taxes described in a. and b. above shall be governed by such applicable law that most favors coverage for such taxes;

iii. matters which may be deemed uninsurable under the law pursuant to which this Policy shall be construed; provided, however, that this Policy shall be governed by such applicable law that most favors insurability. The Insurer shall not assert that **Sox 304/Dodd-Frank 954 Costs** or the portion of any settlement or **Defense Costs** in a **Securities Claim** which relates to any alleged violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, constitutes uninsurable loss;

iv. any amount for which an **Insured Person** is absolved from payment by reason of any covenant, agreement or court order;

v.  any amount attributable to the cost of any non-monetary relief, including without limitation any costs associated with compliance with any injunctive relief of any kind or nature;

vi. any amount of any judgment or settlement of any **Inadequate Consideration Claim** other than **Defense Costs** and other than as set forth in paragraph 3. above;

vii. **Clean-Up Costs**.

**Manager** means any natural person manager, member of the Board of Managers, management committee member, general partner or equivalent executive of an **Insured Entity** that is a limited liability company, joint venture or partnership.

**Management Control** means:

1.  owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of the directors, trustees, or **Managers** of an entity; or
2.  having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of an entity, to elect, appoint or designate a majority of the directors, trustees, or **Managers** of an entity.

Case 2:18-cv-02034-LA   Filed 12/28/18   Page 5 of 15   Document 1-1


JOY GLOBAL INC.
MANAGEMENT LIABILITY SOLUTIONS

**Named Executive Officer** means the chief executive officer and the chief financial officer of the **Named Insured**.

**Named Insured** means the company named in Item 1 of the Declarations, including such company as a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country.

**Non-Indemnified Loss** means Loss which an **Insured Entity** fails or refuses to indemnify an **Insured Person**, including but not limited to any such failure or refusal to indemnify:

a.  because of the **Financial Insolvency** of the **Insured Entity**; or
b.  because the **Insured Entity is** not permitted to indemnify pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of an **Insured Entity**.

**Not-For-Profit Outside Entity** means any entity, other than an **Insured Entity**, exempt from federal income taxation.

**Outside Entity** means any **Not-For-Profit Outside Entity** or any for-profit entity, other than an **Insured Entity**, whose securities are not publicly owned or traded.

**Outside Entity Executive** means an **Executive** of an **Insured Entity** who is or was acting as an **Executive** in any **Outside Entity**, provided and so long as such service is part of the **Executive's** regularly assigned duties with the **Insured Entity** or is at the request, consent or direction of the **Insured Entity.**

**Policy Period** means the period from the effective date of this Policy to the Policy expiration date stated in Item 2 of the Declarations, or its earlier cancellation date.

**Political Action Committee** means Joy Global Inc. Political Action Committee.

**Political Action Claim** is a **Claim** based upon or arising out of a **Political Action Wrongful Act**.

**Political Action Wrongful Act** means any actual or alleged violation of the responsibilities, obligations or duties imposed by the Federal Election Campaign Act of 1971, Chapters 95 and 96 of the Internal Revenue Code of 1954, including amendments thereto, or any similar Federal, state or local statutory law, by the **Political Action Committee** or by an **Executive** of the **Political Action Committee** in his or her capacity as such, or claimed against such **Executive** solely by reason of his or her status as such.

**Pollutants** means any substance exhibiting hazardous characteristics as is or may be defined or identified on any list of hazardous substances issued by the United States Environmental Protection Agency or any state, local or foreign counterpart. **Pollutants** also means, without limitation, any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste (including materials to be recycled, reconditioned or reclaimed), as well as any air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos, or asbestos products or any noise.

**Regulatory Authority** means:

1.  any federal, state, local or foreign law enforcement authority or other governmental investigation authority (including, but not limited to, the U.S. Department of Justice, the U.S. Securities and Exchange Commission and any attorney general), or
2.  the enforcement unit of any securities or commodities exchange or other self-regulatory organization.

**Securities Claim** means a **Claim** made against any **Insured**:
GSL36982XX (08-16)
Page 7

©CNA All Rights Reserved.



JOY GLOBAL INC.
MANAGEMENT LIABILITY SOLUTIONS

1.  alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an **Insured Entity**; or
2.  brought by or on behalf of one or more security holders of an **Insured Entity** in their capacity as such;

provided that a **Securities Claim** includes an administrative or regulatory proceeding (other than an investigation) against an **Insured Entity** only if and only during the time that such proceeding is also commenced and continuously maintained against an **Insured Person**;

**Shareholder Derivative Demand** means any written demand by one or more securities holders of the **Insured Entity** upon the board of directors (or equivalent management body) of such **Insured Entity** to bring a civil proceeding on behalf of the **Insured Entity** in a court of law against any **Insured Person** for a **Wrongful Act**.

**Shareholder Derivative Demand Investigation** means, after receipt by an **Insured** of a **Shareholder Derivative Suit** or a **Shareholder Derivative Demand**, any investigation conducted by the **Insured Entity**, or on behalf of the **Insured Entity** by its board of directors (or the equivalent management body) or any committee of the board of directors (or equivalent management body), as to how the **Insured Entity** should respond.

**Shareholder Derivative Demand Investigation Costs** mean reasonable fees, costs and expenses incurred by the **Insured Entity** or by the board of directors (or equivalent management body) or any committee of the board of directors (or equivalent management body), of such **Insured Entity** in connection with all **Shareholder Derivative Demand Investigations**, but in no event shall **Shareholder Derivative Demand Investigation Costs** include any costs, fees, or expenses incurred in a **Securities Claim**. **Shareholder Derivative Demand Investigation Costs** do not include salaries, wages, fees, overhead or benefit expenses associated with the directors, officers, and employees of the **Insured Entity**.

**Shareholder Derivative Suit** means a lawsuit purportedly brought derivatively on behalf of an **Insured Entity** by a securities holder of such **Insured Entity** against an **Insured Person.**

**SOX 304/Dodd-Frank 954 Costs** means the reasonable fees, costs and expenses consented to by the Insurer (including the premium or origination fee for a loan or bond) and incurred by an **Executive** to investigate or defend any **Claim** pursuant to, or to facilitate the return of amounts required to be repaid by such **Executive** pursuant to, Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954 of the Dodd-Frank Act of 2010 or any rules, regulations or policies pursuant to such sections. **SOX 304/Dodd Frank 954 Costs** do not include the payment, return, reimbursement, disgorgement or restitution of any such amounts requested or required to be repaid by such **Executive** pursuant to, Section 304(a) of the Sarbanes-Oxley Act or Section 954 of the Dodd-Frank Act.

**Subsidiary** means:
1.  any entity (including a partnership) in which the **Named Insured** has **Management Control** directly or indirectly through one or more other **Subsidiaries**:

    a.  on or before the effective date of this Policy; or
    b.  after the effective date of this Policy by reason of being created or acquired by the **Insured Entity** after such date, if and to the extent coverage with respect to the entity is afforded pursuant to Section XV.1; or
2.  any not-for-profit entity under section 501(c) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by the **Insured Entity**.

**Subsidiary** shall also include Joy Global Foundation, Inc.

**Takeover** means:

GSL36982XX (08-16)
Page 8

©CNA All Rights Reserved.



1. the acquisition by another entity or person, or group of entities or persons acting in concert, of:

    a. the ownership or control of voting stock of the **Named Insured** resulting in such entity, person or group owning or controlling more than 50% of the voting stock of the **Named Insured**, or
    b. assets of the **Named Insured** resulting in such entity, person or group owning more than 50% of the total consolidated assets of the **Named Insured** as of the date of the **Named Insured's** most recent audited consolidated financial statement prior to such acquisition;

2. the merger of the **Named Insured** into another entity such that the **Named Insured** is not the surviving entity; or
3. the consolidation of the **Named Insured** with another entity.

**Whistleblower Activity** means the kind of activity described in Section 806 of the Sarbanes-Oxley Act of 2002, or any similar Federal, state, local or foreign statute regardless of whether or not such activity is done by an employee protected under such statute or any similar Federal, state, local or foreign statute.

**Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed or attempted by:

1. an **Executive** in his or her capacity as such or any matter claimed against such **Executive** solely by reason of his or her status as such;
2. an **Employee** in his or her capacity as such, but solely in regard to any:
    a. **Claim** that is also made and continuously maintained against an **Executive** of an **Insured Entity**;
    b. **Securities Claim**; or,
3. with respect to any **Outside Entity Executive**, by such **Outside Entity Executive** in his or her capacity as such or any matter claimed against such **Outside Entity Executive** solely by reason of his or her status as such; or
4. an **Insured Entity**, but solely in regard to a **Securities Claim**.

**Wrongful Act** also means a **Political Action Wrongful Act** and, solely with respect to Insuring Agreement I. 5., **Wrongful Act** includes a **Corporate Manslaughter Wrongful Act** by an **Insured Entity**.

**Wrongful Employment Practice** means any **Wrongful Act** constituting or relating to:

1. wrongful dismissal or discharge or termination of employment, whether actual or constructive;
2. employment-related misrepresentation;
3. violation of any federal, state or local laws (whether common-law or statutory) concerning employment or discrimination in employment, including but not limited to the Americans with Disabilities Act of 1992, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1866;
4. sexual harassment or other workplace harassment including without limitation offensive, intimidating, coercive or unwelcome advances, contact or communication or bullying;
5. wrongful deprivation of career opportunity, failure to grant tenure, demotion, or failure to employ or promote;
6. employment-related wrongful reference, fraudulent inducement, or adverse change in terms, conditions or status of employment;
7. wrongful discipline;
8. retaliation;
9. negligent evaluation of employees;
10. failure to adopt adequate workplace or employment policies and procedures;
11. employment-related defamation, humiliation or invasion of privacy; or

GSL36982XX (08-16)
Page 9

©CNA All Rights Reserved.



12. with respect to any of the foregoing items (1) through (10) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress, failure to provide or enforce adequate or consistent corporate policies and procedures, or violation of an individual's civil rights;

but only if such **Wrongful Employment Practice** relates to an **Executive** of, an **Employee** of or an applicant for employment with an **Insured Entity** or to an **Outside Entity Executive**, whether committed directly, indirectly, intentionally or unintentionally. In addition, with respect to any natural person customer or client, **Wrongful Employment Practice** shall mean only actual or alleged discrimination, sexual harassment or violation of an individual's civil rights relating to such discrimination or sexual harassment, whether committed directly, indirectly, intentionally or unintentionally.

## III. EXCLUSIONS

The Insurer shall not be liable to pay **Loss** under this Policy in connection with that part of any **Claim** made against the **Insured Persons** or the **Insured Entity**:

1. **Bodily Injury/Property Damage**

    for any actual or alleged bodily injury (including death), sickness, disease, emotional distress, or mental anguish of any person, or damage to or destruction of any tangible property, including loss of use of such damaged or destroyed property, where it is established in a final and non-appealable adjudication by the judge, jury, or arbitrator that such injuries took place. Provided however, that this exclusion shall not apply to: (i) allegations of emotional distress or mental anguish by a claimant in an **Employment Practices Claim**; (ii) any **Non-Indemnified Loss**; (iii) a **Securities Claim**; or, (iv) **Corporate Manslaughter Act Defense Costs**;

2. **ERISA or any Similar Act**

    for any actual or alleged violation of the responsibilities, obligations or duties imposed upon fiduciaries by ERISA or any similar act;

3. **Prior Notice**

    based upon or arising out of:

    a. any **Wrongful Act** or any matter, fact, circumstance, situation, transaction, or event notice of which was made by an **Insured** and accepted under any directors and officers liability policy of which this Policy is a direct or indirect renewal or replacement; or
    b. any other **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** described in a. above, would constitute **Interrelated Wrongful Acts**;

4. **Prior or Pending**

    based upon or arising out of or constituting any civil, criminal, administrative or regulatory proceeding, investigation or arbitration against any of the **Insureds** which was pending on or prior to the Prior or Pending Date set forth in Item 8 of the Declarations for the same or essentially the same fact, circumstance, situation, transaction or event underlying or alleged in such civil, criminal, regulatory or administrative proceeding, investigation or arbitration;

5. **Illegal Profits/Deliberate Acts**

    for:

GSL36982XX (08-16)
Page 10

©CNA All Rights Reserved.

Case 2:18-cv-02034-LA   Filed 12/28/18   Page 7 of 15   Document 1-1



a. the gaining of any personal financial profit, remuneration or financial advantage to which such **Insured** was not legally entitled; or
b. the committing of any deliberate fraudulent or deliberate criminal act by such **Insured**;

if established in a final non-appealable adjudication in the underlying proceeding; provided that this exclusion not apply to **Defense Costs**. Solely with respect to paragraph b. above, with respect to any act or omission which is treated as a criminal violation in a **Foreign Jurisdiction** but that is not treated as a criminal violation in the United States of America, the imposition of a criminal fine or other criminal sanction in such **Foreign Jurisdiction** will not, by itself, be conclusive proof that a deliberate criminal or deliberate fraudulent act occurred.

Paragraph a. does not apply to that portion of **Loss** attributable to violations of Section, 11, 12 or 15 of the Securities Act of 1933 in a **Securities Claim** or to any **Securities Claim** arising out of an Initial Public Offering or any follow-on Public Offering or Private Placement Offering of securities of the **Insured Entity**;

Paragraph b. does not apply to any director of the **Insured Entity** who is not now and never has been an officer or employee of any **Insured Entity**.

For purposes of determining the applicability of this Exclusion:

i. the facts pertaining to and knowledge possessed by any **Insured Person** shall not be imputed to any other **Insured Person**; and
ii. only facts pertaining to and knowledge possessed by any past, present or future **Named Executive Officer** shall be imputed to the **Insured Entities**.

6. **Wrongful Acts of Executives of other Entities**

   for any **Wrongful Act** by such **Insured Person** while serving in the capacity, or solely by reason of their status, as a director, officer, trustee, governor, manager, employee or similar position in any entity, other than an **Insured Entity**, a **Political Action Committee** or an **Outside Entity**.

7. **Insured Entity vs. Insured**

   by or on behalf of any **Insured Entity** against any **Insured**, provided, however, that this Exclusion shall not apply to:

   a. any **Shareholder Derivative Demand** or **Shareholder Derivative Suit** provided that such **Shareholder Derivative Demand** or **Shareholder Derivative Suit** is brought and maintained solely by persons acting independent of and without the solicitation, assistance, active participation or intervention of the **Insured Entity** or an **Executive** (unless such solicitation, assistance, participation or intervention is **Whistleblower Activity**);
   b. any **Defense Costs** which constitute **Loss** incurred by the **Insured Person** under Insuring Agreement 1;
   c. any **Claim** if the **Insured Entity** is the subject of a bankruptcy case or other insolvency proceeding (or the equivalent in a **Foreign Jurisdiction**), provided this paragraph c. shall apply (and this exclusion 7. shall not apply) to any **Claim** brought by the **Insured Entity** as a debtor-in-possession only if such **Claim**: (i) is against an **Insured Person** who is no longer acting in his or her capacity as an **Insured Person** at the time such **Claim** is brought; (ii) is brought after the **Named Insured** has replaced its chief executive officer, chief financial officer and chairman of the board (or equivalent positions); and (iii) is not brought, controlled or materially assisted by any individual set forth in paragraph (ii) above, unless such assistance is **Whistleblower Activity**; or

GSL36982XX (08-16)
Page 11

©CNA All Rights Reserved.



JOY GLOBAL INC.
MANAGEMENT LIABILITY SOLUTIONS

d. any **Claim** brought against an **Insured Person** in a **Foreign Jurisdiction** that is not a **Common Law Country**.
e. any **Claim** brought by the **Insured Entity** after a **Takeover** of such **Insured Entity** against a past **Executive** who is not currently serving in any capacity for the **Insured Entity** (including in the capacity as a consultant) at the time such **Claim** is made against such **Executive**; or

8. **Political Action Wrongful Acts**

   solely with respect to a **Political Action Claim**:

   a. for libel or slander;
   b. for any **Political Action Wrongful Act** if a final non-appealable adjudication in such **Political Action Claim** establishes that such **Insured Person** is adjudged to have knowingly and willfully violated the Federal Election Campaign Act of 1971, Chapters 95 and 96 of the Internal Revenue Code of 1954 or any similar statutory law of the United States of America or any state or jurisdiction;
   c. for any **Political Action Wrongful Act** committed in the **Insured Persons'** capacities as fiduciaries as defined in **ERISA or Any Similar Act** for any Pension, Profit Sharing or Welfare Plan(s) of an **Insured Entity**; or
   d. by or on behalf of, or for the benefit of the **Political Action Committee**.

## IV. LIMIT OF LIABILITY/RETENTION/FAILURE TO INDEMNIFY

1. **Aggregate Limit of Liability**

   The Limit of Liability stated in Item 6 a. of the Declarations is the aggregate limit of the Insurer's liability for all **Loss** under this Policy arising out of all **Claims** first made against **Insureds** during the **Policy Period** and the Extended Reporting Period (if applicable). The Limit of Liability for the Extended Reporting Period shall be part of and not in addition to the Limit of Liability for the **Policy Period**. Further, a **Claim** which is made subsequent to both the **Policy Period** and the Extended Reporting Period (if applicable) and which pursuant to Section VI. is considered made during the **Policy Period** or Extended Reporting Period shall also be subject to the one aggregate Limit of Liability stated in Item 6 a. of the Declarations.

   **Defense Costs** are part of **Loss** and as such are subject to the Limit of Liability for **Loss**.

2. **Shareholder Derivative Demand Investigation Costs and Books and Records Costs Sub-Limit of Liability**

   The Limit of Liability stated in Item 6 b. of the Declarations is the aggregate sublimit of the Insurer's liability for all **Shareholder Derivative Demand Investigation Costs** arising out of all **Shareholder Derivative Demands**, and all **Books and Records Costs** arising out of all **Books and Records Demands**, first made during the **Policy Period** and the Extended Reporting Period (if applicable). Such sublimit shall be part of and not in addition to the aggregate limit of liability stated in Item 6 a. of the Declarations. Further, a **Shareholder Derivative Demand** or **Books and Records Demand** which is received by the **Insured Entity** subsequent to both the **Policy Period** and the Extended Reporting Period (if applicable) and which pursuant to Section VI., paragraph 2. or 3. is considered made during the **Policy Period** or Extended Reporting Period shall also be subject to the sublimit stated in Item 6 b. of the Declarations and further subject to the aggregate limit of liability stated in Item 6 a. of the Declarations.

3. **Corporate Manslaughter Investigation Costs Sub-Limit of Liability**

GSL36982XX (08-16)
Page 12

©CNA All Rights Reserved



The Limit of Liability stated in Item 6 c. of the Declarations is the aggregate sublimit of the Insurer's liability for all **Corporate Manslaughter Act Defense Costs** arising out of all **Claims** first made against **Insured Entity** during the **Policy Period** and the Extended Reporting Period (if applicable). The **Corporate Manslaughter Act Defense Costs** Insuring Agreement sublimit shall be part of and not in addition to the aggregate limit of liability stated in Item 6 a. of the Declarations. Further, a **Claim** which is first made against the **Insured Entity** subsequent to both the **Policy Period** and the Extended Reporting Period (if applicable) and which pursuant to Section VI., paragraph 2. or 3. is considered made during the **Policy Period** or Extended Reporting Period shall also be subject to the **Corporate Manslaughter Act Defense Costs** Insuring Agreement sublimit and further subject to the aggregate limit of liability stated in Item 6 a. of the Declarations.

4. Retention

    The Insurer shall only be liable for the amount of **Loss** arising from each **Claim** which is in excess of the applicable Retention amount stated in Item 7 of the Declarations. The Retention amount shall apply to **Loss** arising from each **Claim** and from all **Claims** alleging the same **Wrongful Act** or **Interrelated Wrongful Acts**. The Insurer will have no obligation to pay all or any portion of any applicable retention. No retention applies with respect to **Non-Indemnified Loss**.

    No retention shall apply to a **Shareholder Derivative Demand** or **Books and Records Demand** covered under Insuring Agreement 4 and no retention shall apply to a **Claim** covered under the **Corporate Manslaughter Defense Costs** Insuring Agreement I. 5.

5. Failure or Refusal to Indemnify/Presumptive Indemnification

    a. If for any reason an **Insured Entity** fails or refuses to advance, pay or indemnify covered **Loss** of an **Insured Person** within the applicable Retention, if any, then the Insurer shall advance such amounts on behalf of the **Insured Person** until either an **Insured Entity** has agreed to make such payments, or the Retention has been satisfied. In no event shall any such advancement by the Insurer relieve any **Insured Entity** of any duty it may have to provide advancement, payment or indemnification to any **Insured Person**.

    Advancement, payment or indemnification of **Loss** of an **Insured Person** by an **Insured Entity** shall only be deemed failed or refused to the extent such advancement, payment or indemnification is not provided, or agreed to be provided, or acknowledged by and collectible from an **Insured Entity**. Any payment or advancement by the Insurer within an applicable Retention shall apply towards the exhaustion of the applicable Limit of Liability.

    "Fails" or "failed", as used herein, means an **Insured Person** requested in writing that the **Insured Entity** advance, pay or indemnify an **Insured Person** for **Loss** and such advancement, payment or indemnification has not been provided by, agreed to be provided by or acknowledged as an obligation by the **Insured Entity** within 30 days of such request. "Refuses" or "refused", as used herein, means that an **Insured Entity** gave written notice to the **Insured Person** that it would not honor his or her request to pay, advance or indemnify for **Loss**.

    b. The **Insured Entity** agrees to indemnify the **Insured Persons** for **Loss** or to advance **Defense Costs** to the fullest extent permitted by law. If the Insurer pays any amount as set forth in paragraph a. above, then the **Insured Entity** shall reimburse the Insurer for such amounts within the applicable retention and such amounts shall become immediately due and payable as a direct obligation of the **Insured Entity** to the Insurer. The failure of an **Insured Entity** to perform any of its obligations to indemnify the **Insured Persons** or advance **Defense Costs** under this Policy shall not impair the rights of an **Insured Person** under this Policy.



V. SETTLEMENT/DEFENSE OF CLAIMS/ALLOCATION OF LOSS/ADVANCEMENT OF DEFENSE COSTS

1. Settlement/Insurer's Consent

    The **Insureds** shall not admit or assume any liability, consent to any judgment, agree to any settlement or make any settlement offer without the Insurer's prior consent, such consent not to be unreasonably withheld or delayed. The Insurer shall not be liable for any **Loss** incurred by an **Insured** to the extent the **Loss** results from such **Insured** admitting liability, consenting to any judgment, agreeing to any settlement or making any settlement offer without the Insurer's prior consent. The **Insureds** agree that they shall not knowingly take any action while a **Claim** is pending which increases the Insurer's exposure for **Loss** under this Policy.

    Notwithstanding the above, if the **Insureds** are able to settle all **Claims** which are subject to a single Retention for an aggregate amount, including **Defense Costs**, not exceeding such Retention, the Insurer's consent shall not be required for the settlement of such **Claims**.

2. Defense of Claims

    The **Insureds** and not the Insurer have the duty to defend **Claims**. The Insurer shall be entitled to effectively associate in the defense and the negotiation of any settlement of any **Claim** that involves or appears reasonably likely to involve the Insurer.

3. Allocation of Loss

    If a **Claim** made against the **Insureds** includes both covered and uncovered matters or if a **Claim** is made against **Insureds** who are extended coverage therefor and others (including the **Insured Entity** for **Claims** other than **Securities Claims**) who are not extended coverage therefor, the **Insureds** agree that there must be an allocation between insured and uninsured loss. The **Insureds** and the Insurer shall exert their best efforts to agree upon a fair and proper allocation between insured and uninsured loss.

4. Conditions for Advancement of Defense Costs

    The Insurer, on behalf of the **Insureds**, shall advance **Defense Costs** no later than thirty (30) days after the receipt by the Insurer of itemized defense bills in excess of the applicable Retention. However, advancement of **Defense Costs** shall be subject to the following conditions:

    a. if the **Insureds** and the Insurer agree on an allocation of insured and uninsured **Defense Costs**, the Insurer shall advance the amount of insured **Defense Costs**;
    b. if the **Insureds** and the Insurer cannot, after exerting their best efforts, agree on an allocation of insured and uninsured **Defense Costs**, the Insurer then shall advance the percentage of **Defense Costs** which the Insurer states to be fair and proper until a different allocation is agreed upon or determined pursuant to the provisions of this Policy and applicable law;
    c. the **Insureds** shall repay to the Insurer, severally according to their respective interests, any **Defense Costs** finally established not to be insured under this Policy; and
    d. any allocation or advancement of **Defense Costs** shall not apply to or create any presumption with respect to the allocation of other **Loss**.

VI. REPORTING/DATE OF CLAIM/INTERRELATED CLAIM CLAUSE

1. Notice of Claim

    The **Insureds** shall give written notice to the Insurer of a **Claim**, other than an **Inquiry**, as soon as practicable or within sixty (60) days, whichever is longer, after the **Named Insured's** General Counsel or

Case 2:18-cv-02034-LA   Filed 12/28/18   Page 9 of 15   Document 1-1



Risk Manager (or equivalent positions) first become aware of such **Claim**, but in no event later than ninety (90) days after the end of the **Policy Period** or the Extended Reporting Period if applicable or one-hundred and eighty (180) days if the Policy is renewed with the Insurer. Failure to give such notice as soon as reasonably practicable shall not invalidate coverage of such **Claim**, unless the failure to provide timely notice has materially prejudiced the Insurer. Provided, the Insurer shall have no obligations under this Policy with respect to any **Claim** until such **Claim** is reported in accordance with the terms of this Policy.

If a **Claim** arises out of the same actual or alleged facts or circumstances that gave rise to an **Inquiry** (a "related **Inquiry**") previously reported by the **Insureds** to the Insurer, it is a condition precedent to coverage for such **Claim** that it be separately reported to the Insurer as set forth in the preceding paragraph. Such **Claim** shall be deemed to have been first made at the time such related **Inquiry** was first noticed to the Insurer.

If a **Claim** arises out of a related **Inquiry** which was not reported to the Insurer, such **Claim** shall be subject to the reporting requirements of the first paragraph of this subsection, and the **Insureds'** decision not to report such related **Inquiry** shall not invalidate or adversely impact coverage for said **Claim** under Section VI of the **Policy**.

2. **Notice of Circumstance**

   If during the **Policy Period** or Extended Reporting Period, the **Insureds** first become aware of any facts or circumstances which may reasonably be expected to give rise to a **Claim** and during such **Policy Period** or Extended Reporting Period gives written notice to the Insurer of:

   a. the **Wrongful Act** allegations anticipated as the basis of the potential **Claim** and the names of any potential claimants;
   b. the general identity of the class of **Insureds** allegedly responsible for such **Wrongful Act**,
   c. the consequences which have resulted or may result from such **Wrongful Act**,
   d. the nature of the potential monetary damages or non-monetary relief which may be sought in consequence of such Wrongful **Act**, and
   e. the circumstances by which **Insureds** first became aware of such facts or circumstances;

   then any **Claim** otherwise covered pursuant to this Policy which is subsequently made and which arises out of such facts or circumstances shall be deemed to have been first made against the **Insured** and reported to the Insurer by the **Insureds** at the time such written notice was received by the Insurer. No coverage is provided for fees and expenses incurred prior to the time such notice results in a **Claim**.

3. **Interrelated Claims**

   More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** which shall be deemed to have been first made on the earlier of:

   a. the date on which the earliest such **Claim** was first made, or
   b. the first date valid notice was given by the **Insureds** to the Insurer under this Policy or under any prior policy of any **Wrongful Act**, fact, circumstance, situation, event or transaction which underlies any such **Claim**.

4. **To Whom Notices are Sent**

   The **Insureds** shall give written notice (including via electronic mail) to the Insurer under this Policy as specified in Item 4 of the Declarations. Notice shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent to the proper address, whichever is earlier, subject to proof of transmittal.



JOY GLOBAL INC.
MANAGEMENT LIABILITY SOLUTIONS

VII. **EXTENDED REPORTING PERIOD**

1. **Optional Extended Reporting Period**

   If the Insurer or the **Named Insured** cancels (other than for non-payment of premium) or non-renews this Policy, the **Insured** shall have the right to purchase, upon payment of an additional premium determined as described in the Declarations, an extension of this Policy for:

   a. **Claims** first made;, or
   b. circumstances reported to the Insurer pursuant to Paragraph VI. 2,

   during such Extended Reported Period, and provided further that such **Claim** or circumstance must arise out of a **Wrongful Act** committed before the earlier of the end of the **Policy Period** or the effective date of any **Takeover**.

   This period shall be referred to as the Extended Reporting Period.

2. **Payment of Extended Reported Period Premium**

   As a condition precedent to the right to purchase the Extended Reporting Period, the total premium for this Policy must have been paid. The right to purchase the Extended Reporting Period shall end unless the Insurer receives written notice of the **Insured's** election to purchase the Extended Reporting Period and full payment of the premium for such period within 60 days after the end of the **Policy Period**.

3. **Non-Cancelable/Premium Fully Earned**

   If the Extended Reporting Period is purchased, it is non-cancelable and the entire premium shall be deemed fully earned at its commencement without any obligation by the Insurer to return any portion thereof.

4. **No Separate Limit**

   There is no separate or additional Limit of Liability for the Extended Reporting Period.

VIII. **CANCELLATION**

1. **Insurer's Right to Cancel**

   The Insurer shall not cancel this Policy except for non-payment of any premium when due. The Insurer shall provide to the **Named Insured** written notice of such cancellation stating when, not less than 15 days thereafter, such cancellation shall be effective, except that non-payment of premium due at inception of this Policy will result in the Policy being cancelled effective as of the inception date.

2. **Named Insured's Right to Cancel**

   The **Insureds** grant the exclusive authority to cancel this Policy to the **Named Insured**. The **Named Insured** may cancel this Policy by providing the Insurer written notice stating when thereafter such cancellation shall be effective. The mailing or delivery of such notice shall be sufficient. However, the premium for this Policy shall be deemed fully earned at the inception of this Policy.

©CNA All Rights Reserved.

©CNA All Rights Reserved.

Case 2:18-cv-02034-LA   Filed 12/28/18   Page 10 of 15   Document 1-1



### IX. TERRITORY

Coverage shall apply to **Claims** made and **Wrongful Acts** committed worldwide.

If permitted by applicable law, when determining coverage under this Policy for **Loss** from that portion of any **Claim** maintained in a **Foreign Jurisdiction** or to which the law of a **Foreign Jurisdiction** is applied, the **Insurer** shall apply to such **Claim** the terms and conditions of this Policy, as amended to include the terms and conditions of the **Foreign Policy** in such **Foreign Jurisdiction** that are more favorable to **Insureds** in the **Foreign Jurisdiction**. However, this paragraph shall not apply to: (i) any provision of any **Foreign Policy** addressing limits of liability, retentions, other insurance, non-renewal, duty to defend, defense within or without limits, taxes, conformance to law or excess liability coverage or, any claims made provisions, and (ii) any endorsement to this Policy that excludes or limits coverage for specific events or litigation or that specifically states that it will have worldwide effect.

Any **Loss** covered under Insuring Agreement 1 which is incurred by an **Insured Person** in a **Foreign Jurisdiction** shall, to the extent permissible under applicable law, be paid to such **Insured Person** in a jurisdiction mutually acceptable to such **Insured Person** and the Insurer.

### X. APPLICATION

The **Application** shall be considered as a separate application for each of the **Insured Persons**. Under no circumstances shall the coverage provided by this Policy under Insuring Agreement 1. be deemed void, whether by rescission or otherwise, once the premium has been paid.

With respect to the **Application**, knowledge possessed by any **Insured Person** or by any **Insured Entity** shall not be imputed to any other **Insured Person.**

The Insurer has relied upon the accuracy and completeness of the statements, information and representations contained in the **Application**. All such statements, information and representations are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy.

If the statements, information and representations in the **Application** were not complete and accurate as of the date of the **Application** and such incomplete or inaccurate disclosure materially affected either the acceptance of the risk or the hazard assumed by the **Insurer** under this Policy, then the **Insurer** shall have the right to void coverage *ab initio*:

1. under Insuring Agreement 2, with respect to the **Insured Entity** to the extent it indemnifies any **Insured Person** who knew as of the effective date of this Policy the facts that were misrepresented or omitted;

2. under Insuring Agreements 3., 4. and 5. with respect to the **Insured Entity** if any **Named Executive Officer** knew as of effective date of this Policy the facts that were misrepresented or omitted.

The foregoing applies even if the **Insured Person** did not know that such inaccurate or incomplete disclosure had been provided to the **Insurer** or included within the **Application**.

### XI. OTHER INSURANCE

1. If any **Loss** resulting from any **Claim** is insured under any other insurance, this Policy shall apply only as excess over any other valid and collectible insurance unless such other insurance is (i) a personal liability or personal umbrella policy, or (ii) written only as specific excess insurance over the limit of liability provided by this Policy. This Policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this Policy may be obligated to pay **Loss.**

GSL36982XX (08-16)
Page 17


JOY GLOBAL INC.
MANAGEMENT LIABILITY SOLUTIONS

2. Any coverage under this Policy for **Claims** against any **Insured Person** while acting as an **Outside Entity Executive** shall be specifically excess of any insurance and/or indemnification available to such **Outside Entity Executive** from the **Outside Entity**.

### XII. ESTATES, LEGAL REPRESENTATIVES AND SPOUSES

The estates, heirs, legal representatives, assigns, trusts, estate planning vehicles, spouses and any **Domestic Partner** of **Insured Persons** shall be considered **Insureds** under this Policy; provided, however, coverage is afforded to such estates, heirs, legal representatives, assigns, trusts, estate planning vehicles and spouses only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where such **Claim** seeks damages from marital community property, jointly held property or property transferred from the **Insured Person** to the spouse or **Domestic Partner**. No coverage is provided for any act, error or omission of an estate, heir, legal representative, assign, trust, estate planning vehicle, spouse or **Domestic Partner**. All terms and conditions of this Policy, including without limitation the Retention, applicable to **Loss** incurred by the **Insured Person** shall also apply to loss incurred by such estates, heirs, legal representatives, assigns, trusts, estate planning vehicles, spouses and **Domestic Partners**.

### XIII. NO ACTION AGAINST INSURER

No person or organization shall have any right under this Policy to join the Insurer as a party to any **Claim** against the **Insureds** to determine the **Insureds'** liability, nor shall the Insurer be impleaded by the **Insureds** or their legal representatives in any such **Claim**.

### XIV. ASSIGNMENT OF INTEREST

Assignment of interest under this Policy shall not bind the Insurer unless the Insurer's consent to such assignment is endorsed to this Policy.

### XV. COVERAGE FOR NEW SUBSIDIARIES

1. If, after the effective date of this Policy the **Insured Entity** first has **Management Control** of any entity, then such entity and any subsidiaries, directors, officers, trustees, **Managers** or employees of such entity who otherwise would thereby become an **Insured** shall be covered under this Policy, subject to its terms and conditions, provided that if the total assets (as reflected in the most recent audited consolidated financial statements of such entity and the **Insured Entity**) exceed twenty-five percent (25%) of the combined total assets of all **Insured Entities**, as of the inception date of this Policy, then such entity shall be insured under this Policy for a period of 90 days from the effective date of **Management Control** or until the termination of this Policy, whichever is earlier. Coverage shall continue beyond such 90 day period only if the Insurer, at its sole option upon submission of such information as the Insurer may require, and payment of any additional premium or amendment of the provisions of this Policy, agrees to provide coverage for such entity and its subsidiaries, director, officers, trustees, **Managers** or employees.

2. There shall be no coverage under this Policy for any **Wrongful Act** by such entity, or by any persons or entities considered to be **Insureds** pursuant to Section XV.1 above, where such **Wrongful Act** occurred before the date the **Insured Entity** first has such **Management Control**.

### XVI. CHANGE OF STATUS OF INSUREDS

1. Takeover of the Named Insured

    In the event of a **Takeover** of the **Named Insured**, coverage under this Policy shall continue until this Policy is otherwise terminated, but only with respect to **Claims** for **Wrongful Acts** occurring before the

GSL36982XX (08-16)
Page 18

©CNA All Rights Reserved.



effective date of the **Takeover**, unless (i) the Insurer is notified in writing of the **Takeover** prior to the **Takeover** effective date and agrees in writing to provide coverage for **Wrongful Acts** occurring on or after such effective date, and (ii) the **Named Insured** accepts any special terms, conditions and exclusions and pays any additional premium charge required by the Insurer. This Policy may not be canceled after the effective date of the **Takeover** and the entire premium for this Policy shall be deemed earned as of such effective date unless the Extended Reporting Period is purchased in which case the pro-rata unearned premium shall be returned to the **Insured**.

2.  Cessation of **Subsidiary**

    If any organization ceases to be a **Subsidiary** before or during the **Policy Period**, coverage under this Policy for such **Subsidiary** and its **Insureds** shall continue until this Policy is otherwise terminated, but only with respect to **Claims** for **Wrongful Acts** by such **Subsidiary** and its **Insureds** occurring before the effective date of such cessation, unless (i) the Insurer is notified in writing of such cessation prior to the effective date thereof and agrees in writing to provide coverage for **Wrongful Acts** occurring on or after such effective date, and (ii) the **Insured Entity** accepts any special terms, conditions and exclusions and pays any additional premium charge required by the Insurer.

## XVII. ASSISTANCE AND COOPERATION

Each **Insured** shall give the Insurer full cooperation and shall furnish the Insurer with copies of reports, investigations, pleadings, and all related papers, and such other information, assistance and cooperation as the Insurer may reasonably request. The **Insureds** shall do nothing which in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery. The failure of any one **Insured** to comply with this Section XVII. shall not impair the rights of any other **Insured Person** under this Policy. In no event, however, shall the Insurer contend that an **Insured Person's** assertion of his or her Fifth Amendment privilege breaches the **Insured Person's** duty to cooperate with, assist or provide information to the Insurer.

## XVIII. SUBROGATION AND RECOVERY

To the extent it pays any **Loss**, the Insurer shall be subrogated to all the **Insureds'** rights of recovery therefor, including without limitation an **Insured Persons'** right to indemnification or advancement from the **Insured Entity** but only after the **Insureds** have been made whole and are fully compensated for **Loss**. The **Insureds** shall execute all papers necessary to secure such rights, including executing any documents necessary to enable the Insurer effectively to bring suit in their name, and shall take no action which impairs the Insurer's rights of subrogation or recovery.

In no event, however, shall the Insurer exercise its rights of subrogation against any **Insured** under this Policy unless the **Illegal Profits/Deliberate Acts** exclusion applies to such **Insured**.

In the event the Insurer recovers amounts it paid under this Policy, the **Insurer** will reinstate the Limits of Liability of this Policy to the extent of such recovery, less its costs incurred in administering and obtaining such recovery. The Insurer assumes no duty to seek a recovery of any amounts paid under this Policy. The Insurer, in its sole and absolute discretion, shall determine the amounts of costs it incurred, if any, in administering and obtaining such recovery.

## XIX. NOTICES TO THE NAMED INSURED

Any notices to the **Named Insured** under this Policy shall be provided to the **Named Insured** at the last known address and to its insurance agent or broker. If properly mailed to the **Named Insured** at such address, the date of mailing shall constitute the date such notice was given.

©CNA All Rights Reserved.



## XX. CHANGES

Notice to or knowledge possessed by any agent or other person acting on behalf of the Insurer shall not effect a waiver or a change in any part of this Policy or stop the Insurer from asserting any right under the provisions of this Policy, nor shall the provisions be waived or changed except by written endorsement issued to form a part of this Policy.

## XXI. COMPANY AUTHORIZATION

The **Insureds** agree that the **Named Insured** will act on behalf of the **Insureds** with respect to giving of all notice to the Insurer (except notices provided in Section VI.1 or 2), the receipt of notices from the Insurer, the payment of the premiums, the receipt of any return premiums that may become due under this Policy, and the agreement to and acceptance of endorsements.

## XXII. ENTIRE AGREEMENT

The **Insureds** agree that this Policy, including the **Application** and any materials submitted or required to be submitted therewith, and any written endorsement attached, constitute the entire contract existing between them and the Insurer or any of its agents relating to this insurance.

## XXIII. BANKRUPTCY

Bankruptcy or insolvency of any **Insured Entity** or any **Insured Person** shall not relieve the Insurer of any of its obligations hereunder.

Coverage provided under this Policy is intended to protect and benefit the **Insured Persons**. Further, if a liquidation or reorganization proceeding is commenced by the **Named Insured** and/or any other **Insured Entity** (whether voluntarily or involuntarily) under Title 11 of the United States Code (as amended), or any similar state, local or foreign law (collectively "Bankruptcy Law") then, in regard to a covered **Claim** under this Policy, the **Insureds** hereby:

1.  waive and release any automatic stay or injunction to the extent it may apply in such proceeding to the proceeds of this Policy under such Bankruptcy Law; and
2.  agree not to oppose or object to any efforts by the Insurer or any **Insured** to obtain relief from any stay or injunction applicable to the proceeds of this Policy as a result of the commencement of such liquidation or reorganization proceeding.

## XXIV. ORDER OF PAYMENTS

If the amount of any covered **Loss** which is otherwise due and owing by the Insurer under this Policy exceeds the then-remaining Limit of Liability of this Policy, the Insurer shall pay such **Loss** (subject to such Limit of Liability) in the following priority:

1.  first, the Insurer shall pay **Loss** for which coverage is provided under Insuring Agreement 1 of this Policy; then
2.  only after payment of **Loss** has been made pursuant to 1. above, with respect to whatever remaining amount of the Limit of Liability is available after such payment, at the written request of the chief executive officer of the **Named Insured**, the Insurer shall either pay or withhold payment of such other **Loss** for which coverage is provided under Insuring Agreements 2., 3., 4. and 5. of this Policy.

In the event the Insurer withholds payment pursuant to 2. above, then the Insurer shall at such time and in such manner as shall be set forth in written instructions from the chief executive officer of the **Named Insured** remit such payment to an **Insured Entity** or directly to or on behalf of an **Insured Person**. The Insurer's liability with

©CNA All Rights Reserved.

Case 2:18-cv-02034-LA   Filed 12/28/18   Page 12 of 15   Document 1-1



JOY GLOBAL INC.
MANAGEMENT LIABILITY SOLUTIONS

respect to any such delayed **Loss** payment shall not be increased, and shall not include any interest, on account of such delay.

The bankruptcy or insolvency of any **Insured Entity** or any **Insured Person** shall not relieve the Insurer of any of its obligations to prioritize payment of covered **Loss** under this Policy pursuant to this Section.

## XXV. HEADINGS

The descriptions in the headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

## XXVI. VALUATION

All premiums, limits, retentions, **Loss** and other amounts under this policy are expressed and payable in United States of America currency. If any judgment, settlement or any part of **Loss** is expressed or calculated in any other currency, payment of such **Loss** due under this Policy will be made in the currency of the United States of America, at the rate of exchange published in The Wall Street Journal on the date the Insurer's obligation to pay such **Loss** is established, or, if not published on that date, on the date of next publication.

## XXVII. STATE AMENDATORY INCONSISTENCY

In the event there is an inconsistency between a state amendatory endorsement attached to this Policy and any term or condition of this Policy, then, where permitted by law, the Insurer shall apply those terms and conditions of either the amendatory endorsement or this Policy which are more favorable to the **Insured**.

IN WITNESS WHEREOF, the Insurer has caused this Policy to be executed by its Chairman and Secretary, but this Policy shall not be binding upon us unless completed by the attachment of the Declarations.

Chairman                                    Secretary

_[signature]_                               _[signature]_

GSL36982XX (08-16)
Page 21

©CNA All Rights Reserved.

---



TRADE AND ECONOMIC SANCTIONS ENDORSEMENT

In consideration of the premium charged, it is understood and agreed, a new condition is added to the Policy as follows:

This Policy does not provide coverage for Insureds, transactions or that part of loss that is uninsurable under the laws or regulations of the United States concerning trade or economic sanctions.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

GSL7132XX (6-10)
Page 1
Columbia Casualty Company
Insured Name: Joy Global Inc.

Policy No: 287049801
Endorsement No: 1
Effective Date: 07/31/2016

© CNA All Rights Reserved.



### SERVICE OF SUIT ENDORSEMENT

Wherever used in this endorsement Named Insured means the first person or entity named on the declarations page.

In consideration of the premium paid for this Policy, it is agreed that the following provision is added to the Policy:

**SERVICE OF SUIT**

Pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Insurer hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the below-named as the person to whom the said officer is authorized to mail such process or true copy thereof.

Service of process in such suit shall be made upon:

General Counsel
Columbia Casualty Company
333 S. Wabash Ave.
Chicago, IL 60604

and in any suit instituted against such person upon this policy, the Insurer will abide by the final decision of such court or of any appellate court in the event of an appeal.

The General Counsel is authorized and directed to accept service of process on behalf of the Insurer in any such suit and, upon the request of the Named Insured, to give a written undertaking to the Named Insured that he will enter a general appearance upon the Insurer's behalf in the event such suit shall be instituted.

All other terms and conditions of the Policy remain unchanged.

> This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

CNA74300XX (6-14)  
Page 1  
Columbia Casualty Company  
Insured Name: Joy Global Inc.  
© CNA All Rights Reserved.  
Policy No: 287049801  
Endorsement No: 2  
Effective Date: 07/31/2016

---



### JOY GLOBAL INC.
### RUN OFF PERIOD ENDORSEMENT

It is understood and agreed that if there is a **Takeover** of the **Named Insured** during the **Policy Period**, either directly or indirectly, by Komatsu Ltd, then in consideration of an additional premium paid in the amount of $236,250.00 (hereafter "Run-Off Period Premium") the Policy shall be amended as follows.

I. The section entitled **EXTENDED REPORTING PERIOD** and the section entitled **CANCELLATION** are deleted in their entirety and are replaced with the following new section:

**RUN-OFF PERIOD**

1. **Run-Off Period**

   This Policy shall be extended for a period commencing on the effective date of the **Takeover** of the **Named Insured** by Komatsu Ltd and expiring six (6) years thereafter (hereinafter the "Run-Off Period"), but only with respect to:

   a. **Claims** first made against the **Insureds** during the Run-Off Period for any actual or alleged:

      i. **Wrongful Act** occurring prior to the effective date of such **Takeover**; or

      ii. **Wrongful Act** occurring after the effective date of such **Takeover**, which, together with a **Wrongful Act** described in i. above, would constitute **Interrelated Wrongful Acts** (such **Wrongful Act** shall be deemed first committed or first attempted on the date of the earliest or the first **Interrelated Wrongful Act**); or

   b. **Inquiries** first made against the **Insureds** during the Run-Off Period;

   and otherwise covered pursuant to the terms, conditions and restrictions of this Policy.

2. **Payment of Premium**

   As a condition precedent to coverage during the Run-Off Period, the total premium for this Policy and the additional Run-Off Period Premium must have been paid. Prior to the effective date of the **Takeover** of the **Named Insured** by Komatsu Ltd the **Named Insured** shall give notice to the Insurer of the scheduled effective date of such **Takeover** and shall pay to the Insurer the Run-Off Period Premium.

3. **Non-Cancelable/Premium Fully Earned**

   The Run-Off Period is non-cancelable and the entire premium shall be deemed fully earned at its commencement without any obligation by the Insurer to return any portion thereof.

4. **No Separate Limit**

   There is no separate or additional Limit of Liability for the Run-Off Period.

II. Wherever the term "Extended Reporting Period" is used in this Policy, it shall be substituted with the term "Run-Off Period."

III. Item 5. of the Declarations is deleted in its entirety.

CNA87129XX (9-16)  
Page 1  
Columbia Casualty Company  
Insured Name: Joy Global Inc.  
© CNA All Rights Reserved.  
Policy No: 287049801  
Endorsement No: 3  
Effective Date: 07/31/2016

Case 2:18-cv-02034-LA   Filed 12/28/18   Page 14 of 15   Document 1-1



All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**COVERAGE AND CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM**

Wherever used in this endorsement: 1) "We" means the insurer listed on the policy declarations page; and 2) "Your" means the Named Insured listed on the policy declarations page.

This endorsement modifies insurance provided under "your" policy.

In consideration of the premium charge of $0, it is agreed as follows:

This policy provides coverage for losses arising from "Certified Acts of Terrorism" subject to all other terms and conditions of this policy.

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and "we" have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy and expires concurrently with said Policy unless another effective date is shown below.

By Authorized Representative _____
(No signature is required if issued with the Policy or if it is effective on the Policy Effective Date)

Case 2:18-cv-02034-LA   Filed 12/28/18   Page 15 of 15   Document 1-1