UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

Joy Global Inc. (n/k/a Komatsu Mining Corp.),

        Plaintiff,

   vs.

Columbia Casualty Company, *et al*.,

        Defendants.

Case No. 2:18-CV-02034

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT COLUMBIA CASUALTY COMPANY'S MOTION
FOR SUMMARY JUDGMENT ON COUNT IV OF THE COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

INTRODUCTION ................................................................................................... 1

FACTS ................................................................................................................... 2

I.  CNA Underwrote Joy's 2016–17 Program Expecting That Shareholder Claims Would Be Filed Against Joy, And Implied That Its Policy Would Cover Them. ............. 3

    A.  CNA Told Joy to Expect Shareholder Claims from the Proposed Sale. ................. 3

    B.  Joy Expected Industry-Standard Coverage for the Anticipated Claims. ............... 5

    C.  CNA's Underwriters Believed The Shareholder Claims Would Trigger Coverage and Underwrote Coverage on That Basis. ............................................. 6

II.  The Securities Actions Alleged Covered Misrepresentation and Misconduct. ................. 7

III.  CNA Denied Coverage, Then Acknowledged That It Could Not Deny Coverage, And Then Denied Coverage Again, All Without Any Change In The Record. ................. 9

IV.  Joy Settled the *Duncan* Suit Without CNA's Support. .................................................... 12

V.  CNA's Misleading Characterizations of the Joy Witnesses' Testimony. ......................... 13

LEGAL STANDARDS ........................................................................................... 14

ARGUMENT ......................................................................................................... 17

I.  A Rational Juror Can Conclude That CNA Lacked A Reasonable Basis For Determining That No "Part Of" Joy's Loss Is Entitled To Coverage. .............................. 17

    A.  CNA's Blanket Denial of All Indemnity Coverage Rests on an Unreasonable Reading of the Pleadings and Contradicts the CNA Policy's Plain Language. ................................................................................................. 18

    B.  Joy's Settlements Included No "Bump-Up" Payments, and Nearly One-Third of Joy's Payments Did Not Go into Any Plaintiffs' Pockets. ..................... 21

    C.  CNA Ignores How a Reasonable Insurer Would Act Given the Commonly Understood History, Purpose, and Scope of the "Bump-Up" Exclusion. ............. 23

    D.  CNA Sold Insurance Coverage to Joy Specifically for Shareholder Claims Arising Out of the Komatsu Transaction. ............................................................. 24

    E.  CNA Failed to Conduct a Fair and Neutral Evaluation of Joy's Claim. .............. 27

II.  A Rational Juror Can Conclude that CNA Knew, or Recklessly Disregarded, the Absence of a Reasonable Basis to Deny All Indemnity Coverage .................................. 28

III.  Joy Suffered Damages As a Result of CNA's Bad Faith Conduct. ................................. 30

CONCLUSION ...................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Continental Ins. Co.*,
  85 Wis. 2d 675 (Wis. 1978)........................................................................15, 28, 30

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................................14

*Brethorst v. Allstate Prop. & Cas. Ins. Co.*,
  334 Wis. 2d 23 (Wis. 2011)........................................................................ *passim*

*Danner v. Auto-Owners Ins.*,
  245 Wis. 2d 49 (Wis. 2001)........................................................................16, 17

*Go Wireless, LLC v. Md. Cas. Co.*,
  2013 WI App 41 (Wis. Ct. App. 2013)..........................................................25, 26

*Jones v. Secura Ins. Co.*,
  249 Wis. 2d 623 (Wis. 2002)......................................................................15, 30

*Metro. Ventures, LLC v. GEA Assocs.*,
  291 Wis. 2d 393 (2006) ..................................................................................29

*Onyx Pharmaceuticals, Inc. v. Old Republic Ins. Co.*,
  No. CIV 538248 (Cal. Super Ct. Oct. 1, 2020)....................................................20

*Roehl Transp., Inc. v. Liberty Mut. Ins. Co.*,
  325 Wis. 2d 56 (Wis. 2010)........................................................................15, 30

*Safeway Stores, Inc. v. National Union Fire Ins. Co.*,
  64 F.3d 1282 (9th Cir. 1995) ..........................................................................22

*UnitedHealth Group Inc. v. Hiscox Dedicated Corp.*,
  2010 WL 550991 (D. Minn. Feb. 9 2010) .........................................................23

*Van Den Heuvel v. AI Credit Corp.*,
  951 F. Supp. 2d 1064 (E.D. Wis. 2013)............................................................25

*Weiss v. United Fire & Cas. Co.*,
  197 Wis. 2d 365 (Wis. 1995)...................................................................16, 17, 23

*Wis. Local Gov. Prop. Ins. Fund v. Lexington Ins. Co.*,
  2017 WL 4998158 (E.D. Wis. Oct. 31, 2017) .....................................................17

## INTRODUCTION

Wisconsin law imposes upon every insurer a "special duty" of good faith to its insured. In this case, Defendant Columbia Casualty Company ("CNA") breached that duty when it sold to Plaintiff Joy Global Inc. ("Joy" or "Joy Global") a D&O insurance policy *specifically to cover* shareholder claims arising from Joy's announced sale to Komatsu America Corp. ("Komatsu")— claims that CNA told Joy to expect—and then *abruptly denied coverage* for those claims (the "Securities Actions") after they were filed, just weeks later. CNA has breached its duty of good faith because there is no reasonable basis for its coverage position and it knows, or has acted recklessly in disregarding, that (a) the Securities Actions alleged covered "Securities Claims" under the CNA Policy (or the "Policy") which are *not* subject to the Policy's so-called "bump-up" exclusion, and/or (b) Joy's settlements in the Securities Actions include no "bump-up" payments subject to that exclusion. The Policy language and the known history, purpose, and scope of this industry-standard D&O coverage exclusion all refute CNA's contrary position.[1]

Tellingly, while handling Joy's claim, CNA acknowledged that there was no proper basis for its denial of coverage for the Amended Complaint in the *Duncan* suit (the settlement of which accounts for $20 million, or 96%, of the insured loss at issue) because, as pleaded, that suit is not necessarily subject to the "bump-up" exclusion. But contrary to settled Wisconsin law and reasonable claims-handling practices, CNA then asked Joy to prove the *inapplicability* of the exclusion on the basis of information outside the *Duncan* pleadings. That is, CNA told Joy that its Policy's "bump-up" exclusion *presumptively* applied, and CNA would only accept coverage if Joy rebutted that presumption, to CNA's satisfaction, through facts outside the *Duncan* pleadings. When that did not happen, CNA reverted to its blanket coverage denial, untenably asserting that

---

[1] Unless otherwise noted, words capitalized herein have the same meanings ascribed to them in the brief that Joy filed in support of its coverage motion (Joy Coverage Brief, Dkt. 101).

1

no "part of" of Joy's settlements in the Securities Actions escape the "bump-up" exclusion. In so doing, CNA breached a further duty of "good faith" under the Policy: its obligation to "exert . . . best efforts" under the Policy's allocation provision, in cooperation with its policyholder, to cover any "part of" Joy's loss that CNA could not unambiguously prove to be excluded from coverage. In all of this, CNA improperly put its own self-interest ahead of its obligations to its insured.

To prevail on its motion for summary judgment, CNA must prove that, despite ample evidence to the contrary, it exercised "honest, intelligent action or consideration of its insured's claim" *as a matter of law*. *See Brethorst v. Allstate Prop. & Cas. Ins. Co.*, 334 Wis. 2d 23, 41 (Wis. 2011). That is, CNA must prove that no genuine issue of material fact exists (i.e., no rational fact-finder could find for Joy) in regard to whether (1) CNA had a "reasonable basis . . . to deny [Joy]'s claim under the policy," and (2) CNA "knew of or recklessly disregarded" facts and circumstances rendering its coverage denial unreasonable. *Id.* at 46. As is traditionally the case under Wisconsin law, this inquiry is a fact-bound one here, and genuine issues of material fact abound precluding summary judgment.

## FACTS

The core facts are set forth in Joy's Coverage Brief ("JCB," Dkt. 101) and Plaintiff's Proposed Statement of Facts ("PPSOF," Dkt. 102). They are supplemented in Plaintiff's Memorandum in Opposition to Insurers' Motion for Summary Judgment on Counts I and II of the Complaint ("Joy's Coverage Opposition Brief," or "JCOB") and Plaintiff's Proposed Statement of Additional Facts ("PPAF") (both filed today). Joy adopts those submissions here and focuses below on facts that are especially material to its bad faith claim (Count IV).[2]

---

[2] Joy and CNA settled Count III of the Complaint at an earlier stage of this case.

## I. CNA Underwrote Joy's 2016–17 Program Expecting That Shareholder Claims Would Be Filed Against Joy, And Implied That Its Policy Would Cover Them.

CNA does not dispute that (a) Joy announced its planned sale to Komatsu ten days before its 2016–17 D&O program renewal date and informed CNA of its planned sale on that same day (PPSOF ¶ 34, 36); (b) CNA considered the announced sale a "material change in risk" for CNA because shareholder claims challenging the transaction were likely (*see id.* ¶¶ 35–37); and (c) Joy, Marsh, and CNA then engaged in extensive discussions about the expected shareholder claims and Joy's options for proceeding with a coverage renewal (*id.* ¶¶ 38, 40, 43–49). *See* JCB at 7–9. Despite these extraordinary circumstances, which framed its underwriting effort, CNA glosses over key details of the parties' discussions; ignores the impressions CNA conveyed to Joy; and says nothing at all about key internal CNA underwriting communications that have come to light in discovery. This evidence and the policy language, construed (as they must be) in Joy's favor, demonstrate that Joy reasonably expected the Policy to cover shareholder claims of the kind asserted in the Securities Actions.

### A. CNA Told Joy to Expect Shareholder Claims from the Proposed Sale.

When CNA's underwriter on the Joy account, David Lim, learned of Joy's proposed sale to Komatsu on July 21, 2016, he concluded that it potentially increased *CNA's* "exposure" because "a very high percentage of companies that were being acquired were being hit with merger objection lawsuits."[3] PPSOF ¶¶ 37, 38. Mr. Lim was right. Approximately 85–95% of major public company M&A transactions like Joy's proposed sale resulted in shareholder class action lawsuits in the 2011–17 timeframe. *Id.* ¶ 39. Indeed, "based on what [CNA had] been seeing in the market," Mr. Lim believed that a lawsuit against Joy arising from its announced sale "was a matter of not *if*

---

[3] CNA mischaracterizes the transaction as a "Merger." *See* CNA's Bad Faith Br. (Dkt. 98-0) at 4. Joy did not merge into Komatsu but rather, was acquired by Komatsu. *See* PPSOF ¶ 85.

it would happen" but "*when*." *Id.* ¶ 38 (emphasis added). Yet when Mr. Lim replied to Joy's broker (Marsh) on the following day, July 22, about whether the sale "changes anything with the renewal" (*id.* ¶ 36), he did *not* report that CNA would refuse to sell Joy renewal coverage (*id.* ¶ 37). Instead, he reported that he knew law firms *already were "trolling" for claimants* to challenge the sale (*id.* ¶ 40), and that CNA's concern was that it *did not want to have "two limits exposed"* to such claims—i.e., CNA did not want exposure to the anticipated claims under both its expiring policy and a renewal policy (*id.* ¶ 42).

As Ann Longmore, a 30-year veteran of the D&O insurance field, has explained, "the importance of this moment cannot be overstated." PPAF ¶ 13. "From July 22 until the CNA Policy issued on July 31, the parties were discussing the issuance of renewal coverage with a shared expectation of shareholder litigation and for the specific purpose of underwriting coverage to protect Joy Global within such litigation." *Id.* Indeed, the risk of such claims, and the availability of coverage for them, was not foreign to CNA. As Mr. Lim has since testified, "the biggest exposure" of public companies like Joy in the D&O context "is a securities class action," and "one of the reasons" public companies buy D&O insurance is to protect against shareholder class actions arising after the announcement of a corporate merger or acquisition. PPSOF ¶ 5.

CNA offered Joy three options in light of its expectation of shareholder claims arising from the proposed sale. *Id.* ¶¶ 43–47. The first was to buy an extension of the expiring policy to provide coverage for claims filed until, but only until, the transaction closed. *Id.* ¶ 44. Under the second option, Joy would buy a renewal policy with a fresh $10 million limit, provided that it also purchased "run-off" coverage (i.e., coverage for claims filed after the closing, but challenging pre-closing conduct)—for twice the originally quoted premium. *Id.* ¶ 45. The third option was the same as the second, except that it offered Joy a 10% discount if it agreed to pay the full premium upfront.

*Id.* ¶ 46. As a condition of both the second and third options (i.e., for any renewal coverage), Joy would have to agree to forego coverage under the expiring policy. *Id.* ¶ 47.

As Joy's Senior Risk and Compliance Manager, Hiep Phung, recounts, the options that CNA offered, and its related statements, conveyed that CNA "believed that the shareholder claims that it expected to arise from Joy's announced sale could be sufficiently serious to lead to more than $1.5 million in *covered* losses (i.e., losses exceeding Joy's $1.5 million self-insured retention)." PPAF ¶ 15 (emphasis added). As Mr. Phung explained, "If this was not CNA's concern, it would not have been worried about exposing the limits of one policy, let alone two." *Id.*

In the days that followed, with the July 31 expiry date for Joy's 2015–16 program looming, CNA even told Joy that it would not renew coverage if any claim came in before July 31 triggering the expiring coverage. *Id.* ¶ 16. CNA also repeated its prediction that shareholder suits were coming, stating in a conference call on July 27 that it now had identified at least *seven* law firms "trolling" for shareholder plaintiffs. PPSOF ¶ 49.

### B. Joy Expected Industry-Standard Coverage for the Anticipated Claims.

In reliance on CNA's statements, Joy ultimately agreed to the second option offered by CNA—that is, Joy renewed coverage with CNA for 2016–17 with the concessions that CNA demanded. PPSOF ¶ 57; PPAF ¶ 19. In doing so, Joy (a) gave up "any rights to transaction-related coverage it might have had under [the expiring 2015–16 CNA policy]"; (b) "agreed to pay twice as much premium as it had paid for the expiring policy"; and (c) "perhaps most important, . . . agreed not to shop elsewhere and buy its primary insurance for the new policy year *from some other insurer*." PPAF ¶ 20 (emphasis added).

To be sure, Joy's risk manager "did not expect CNA to commit in advance to cover any and all possible claims arising out of Joy's announced sale to Komatsu." *Id.* ¶ 22. But his

5

"understanding and expectation, based on CNA's statements, its focus on this specific exposure, the context and nature of [the] 2016–17 renewal discussions, the significant concessions that CNA extracted from [Joy] for [Joy's] agreement to renew with CNA, and [his] understanding of the purpose and coverages afforded by D&O insurance policies, was that CNA would provide D&O coverage for shareholder claims arising from the announced sale that would be at least as extensive as the industry standard"—and "I understood that this is what we agreed to purchase." *Id.*; *see also id.* ¶ 17 ("[T]he representation we perceived CNA to make is that there would be coverage for the [] M&A claims that were coming."); *see id.* ¶ 21 ("It would have been irrational for Joy Global to have extended these major concessions without believing that it had purchased coverage for the very risk that the renewal discussions were intended to address.").

### C. CNA's Underwriters Believed The Shareholder Claims Would Trigger Coverage and Underwrote Coverage on That Basis.

At the same time that CNA was discussing the policy renewal with Joy and Marsh, CNA's underwriters were having internal conversations about the situation and Joy's coverage. In a July 27, 2016, email, Mr. Lim suggested to his supervisor, Ziad Kubursi, that CNA should adhere to its July 22 position of not exposing two sets of limits, saying he saw "no reasonable price that is worth the trade." PPSOF ¶ 50. In response, Mr. Kubursi asked "[h]ow tight is our *bump up language*"—referring to the "bump-up" exclusion now at issue—"and do we see this [risk] as anything more than nuisance value"? *Id.* ¶ 51 (emphasis added). Mr. Lim responded that the "bump up language" is "standard MLS language," (*id.*), meaning "standard Management Liability Solutions language" found in CNA's typical D&O policy form (*id.* ¶ 52). *See also id.* ¶ 53 ("It was a fairly standard bump-up language that I was used to."). Mr. Kubursi "agreed" that CNA should adhere to its position and expose only one set of limits. *Id.* ¶ 55.

Also on July 27, Mr. Lim exchanged emails with CNA's Underwriting Consulting Director, Graig Natelson. *Id.* ¶ 56. The two men discussed whether CNA should offer Joy an *additional* $10 million of *high-layer* excess D&O coverage for a further $44,000 premium (such that CNA would appear twice in the 2016–17 program, once at the primary layer and again in a high-layer excess position). *Id.* Mr. Natelson was in favor. As he explained to Mr. Lim: "We *may as well* collect an additional $44k for a year. Assuming the merger obj[ection] claim *doesn't become some record breaking claim*, we'll still sit excess $90M'ish." *Id.* (emphasis added).

Consistent with these internal emails and CNA's statements to Joy, at no time between the announcement of the sale to Komatsu on July 21 and CNA's commitment of renewal coverage on July 31, did anyone at CNA ever tell Joy that CNA would not provide indemnity coverage for the sale-related claims that CNA anticipated because CNA thought the "bump-up" exclusion would broadly exclude liabilities for shareholder claims in the M&A context. *Id.* ¶ 61. Indeed, if CNA had told Joy "that CNA had a different or narrower understanding of the D&O coverage that it was selling to [Joy] for the 2016–17 policy year; that its policy might only cover defense costs in excess of [Joy's] $1.5 million retention and not any liabilities arising from the expected shareholder claims; or that its 'bump-up' exclusion might bar coverage for the shareholder claims it was anticipating," then Joy "would have given notice of circumstances under the expiring 2015–16 program to lock in whatever coverage it provided," and "looked elsewhere in the insurance market to purchase broader primary D&O coverage for the 2016–17 policy year." PPAF ¶ 23.

## II.     The Securities Actions Alleged Covered Misrepresentation and Misconduct.

Just as CNA predicted, in the weeks after Joy filed its proxy statement with the SEC, Joy shareholders filed putative class action lawsuits (the Securities Actions) against Joy and various of its directors and officers challenging Joy's proxy statement disclosures and conduct related to those representations. PPSOF ¶¶ 31, 64–68.

7

The Securities Actions alleged securities law violations and securities trading misconduct that falls squarely within the scope of the standard D&O coverage provided by the CNA Policy. *See* JCB at 17–28; JCOB at 14–24. As Ann Longmore, Prof. Steven Solomon, and Dan Bailey have all independently explained, and as Joy has demonstrated in its coverage briefs, such claims are fundamentally different in nature and substance from claims alleging a *purely economic liability*, like appraisal and freeze-out claims, which are the claims targeted and excluded from coverage by the CNA Policy's industry-standard "bump-up" exclusion. *See id.* JCB at 17–28; JCOB at 19–23; PPSOF ¶ 76; *id.* ¶ 105 (e.g., Longmore Rpt. ¶¶ 26, 39–41); *id.* ¶ 111 (e.g., Solomon Rpt. ¶¶ 28–49).

All but one of the Securities Actions were filed in federal court and alleged violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9 (collectively, the "Proxy Fraud Rules"). PPSOF ¶¶ 66–67. All eight alleged that Joy and its directors and officers were liable because they failed to disclose material information in Joy's proxy statements and/or made materially misleading statements, thereby misleading the plaintiff shareholders and depriving them of their rights to make informed decisions about whether to approve the sale. *Id.* ¶ 67–68. As plaintiffs in *Duncan* put it in the very first paragraph of their Amended Complaint, "[t]his matter arises out of the defendants' dissemination of false and misleading proxy statements." *Id.* ¶ 90; *see also id.* ¶¶ 88–90.

For relief, the *Duncan* Amended Complaint sought (a) a judgment "[d]eclaring that the *Proxy* distributed by defendants to shareholders *was materially false and misleading*, in violation of [the Proxy Fraud Rules]" and (b) "compensatory *and/or* rescissory damages," along with (c) interest, "reasonable attorneys' fees, expert fees and costs." PPSOF ¶ 89 (emphasis added). Like the *Duncan* plaintiffs' prayer for rescissory damages *post-sale*, the other seven Securities

Actions (all of which Joy settled *pre-sale*) sought to enjoin the transaction from occurring *at all*. *Id.* ¶¶ 66–67, 77–78.

Joy settled the eight suits in three settlements in return for (a) additional proxy statement disclosures; (b) a combined sum of $5.8 million in plaintiff attorneys' fees; (c) approximately $600,000 in *Duncan* administrative costs; and (d) approximately $14.4 million for distribution to the *Duncan* class members. *Id.* ¶¶ 77–79, 129, 137, 139. No part of *any* of Joy's settlement payments was a "bump-up" payment. *See id.* ¶¶ 130, 132; JCB 13–14; JCOB at 7, 27.

### III. CNA Denied Coverage, Then Acknowledged That It Could Not Deny Coverage, And Then Denied Coverage Again, All Without Any Change In The Record.

In response to Joy's request for coverage of its liabilities in the Securities Actions, and contrary to what CNA had led Joy to expect during the underwriting process (and what the CNA Policy requires), CNA initially asserted a blanket denial of indemnity coverage for the Securities Actions. CNA did this within *hours* of its delayed issuance of the 2016–17 Policy. *See* PPSOF ¶¶ 80–83.

In its November 8, 2016, coverage denial letter, CNA acknowledged that the Securities Actions are "Securities Claims" under the CNA Policy, and further that they alleged violations of the Proxy Fraud Rules and related misconduct. PPSOF ¶ 84; PPAF ¶ 29. CNA conceded, for example, that the plaintiffs "allege . . . that the proxy statement filed with the SEC in relation to the Proposed Merger is materially incomplete and misleading." PPAF ¶ 30. CNA nonetheless invoked and relied on its Policy's "bump-up" exclusion to deny any and all indemnity coverage. PPSOF ¶ 84. In so doing, CNA's denial letter did not even quote the terms of the exclusion, much less attempt to address and distinguish between "that part of" the Securities Actions or Joy's settlements therein that CNA considered to be excluded and *other* "part" that reasonably might be covered. PPAF ¶ 31; *see also id.* ¶ 1 (Policy allocation provision).

In June 2017, after the *Duncan* plaintiffs filed their Amended Complaint seeking "compensatory *and/or rescissory* damages" and after Joy had settled all of the other Securities Actions without paying a cent to the plaintiff shareholders, CNA sent Joy a further letter reaffirming its blanket coverage denial. PPSOF ¶ 91. CNA doubled-down on its "not one penny" coverage position and still made no attempt to distinguish between "that part of" the Securities Actions and settlement payments that it considered excluded and any *other* "part" that reasonably might be covered. *Id.* ¶ 32.

But then one year after CNA's initial coverage denial (and only after Joy retained coverage counsel to challenge CNA), CNA reconsidered and *reversed* its position. PPSOF ¶ 94. Specifically, on October 26, 2017, Joy's counsel wrote to CNA, noting that CNA's coverage denial would waive CNA's right to consent to any proposed settlement in *Duncan*. *Id.* 93. In response, in a letter sent on November 14, 2017, CNA *withdrew* its blanket denial of indemnity coverage and acknowledged that the *Duncan* Amended Complaint might warrant coverage because "it is theoretically possible that rescissory damages might not be equivalent to the quantum of inadequate consideration asserted." *Id.* ¶ 94; *see also id.* ¶ 95 (admitting that "[t]here was some possibility [of coverage] that I couldn't rule out from my perspective sitting at the insurance company desk").

CNA's withdrawal of its coverage denial was only superficially encouraging. <u>First</u>, although CNA withdrew its *denial* of coverage, it did not thereby proceed to *accept* coverage. Instead, it "reserve[d] rights" and demanded that Joy demonstrate why, and to what extent, the "bump-up" exclusion in its Policy did *not* bar all coverage for the *Duncan* claims. Plaintiff's Response to Insurers' Statements of Fact ("PRSOF") ¶ 106 ("Pending receipt of such information, we reserve rights with respect to whether the damages sought by plaintiffs fall outside the

exclusion from the definition of Loss for 'any amount of any judgment or settlement of any Inadequate Consideration Claim other than Defense Costs.'"). That is, even though (as CNA well knows) it was and remains CNA's burden, under both the Policy and Wisconsin law, to prove the complete *or partial* applicability of the "bump-up" exclusion that it invoked—and even though CNA was admitting that the *Duncan* Amended Complaint, *as pleaded*, may warrant coverage— CNA purported to shift the burden to its policyholder, Joy, to prove the complete or partial *inapplicability* of the exclusion by reference to information *outside* the *Duncan* Amended Complaint.

*Second*, CNA's withdrawal of its coverage denial proved only temporary. CNA reversed course a second time, withdrawing its reservation of rights and reasserting its blanket indemnity coverage denial—as soon as Joy reached an agreement in principle to settle the *Duncan* suit for $20 million, and the bill, in effect, came due for payment. PPSOF ¶¶ 98–99.

Joy and the *Duncan* plaintiffs reached their proposed agreement to settle the *Duncan* suit for $20 million in February 2018, and Joy sought consent and coverage from CNA (as well as Defendants Arch and Travelers). *Id.* ¶ 98. At that same time, CNA's senior D&O executives were growing increasingly concerned about Joy's claim and its broader implications for CNA's book of business. PPAF ¶ 37. In internal emails dated just seven days before Joy's formal request for consent (and which CNA produced, with heavy redactions, long after they were requested in discovery), CNA executives questioned whether "we should be reconsidering the merger objection language we use as well as what language we will agree to follow" in light of "what we are experiencing with Joy Global." *Id.* CNA has redacted whatever was said in reply, asserting attorney-client privilege. *Id.* ¶ 38. But in response to whatever CNA has redacted, the executives

in question forwarded the entire email chain to CNA's head of product development with the cryptic note: "We will likely need to address this." *Id.* ¶ 39.

Two weeks later, on March 7, 2018, CNA formally reversed its coverage position (again), reverting to a denial of all indemnity coverage (again) for the *Duncan* suit and settlement (and thus, for all eight Securities Actions and settlements) under its own *previously withdrawn* reasoning that no "part of" the claims or settlements could be covered, given the "bump-up" exclusion. PPSOF ¶ 99. Nothing had changed in the pleadings, posture, or facts of *Duncan* (or any of the other Securities Actions, all of which already had been settled) between CNA's November 14, 2017, letter and its March 7, 2018 letter. *Id.* ¶¶ 96–100; *see id.* ¶ 129 (*Duncan* stipulation of settlement at 1–5); *see also* PPAF ¶ 36 (testimony of Ann Longmore, describing CNA's flip-flop on coverage as "virtually unheard of," "unparalleled," and something she has "never seen before in my decades of experience in the world of D&O"). It is thus difficult, in retrospect, not to see CNA's temporary acknowledgment of the prospect of coverage as a cynical effort to hedge its bets: CNA apparently had no intention of covering any part of Joy's *Duncan* liabilities, but wanted access to Joy's defense counsel and privileged thinking (which Joy cooperatively provided) during settlement negotiations to try to strengthen its hand and exert pressure on Joy. PPSOF ¶ 97.

## IV. Joy Settled the *Duncan* Suit Without CNA's Support.

Without CNA's support, or any guarantee of indemnity coverage, Joy settled the *Duncan* suit for $20 million. *Id.* ¶ 129. No amount of this sum was a "bump-up" payment; rather, as explained by the unrebutted testimony of Sara Francis, who oversaw the settlement for Joy, "Joy agreed to this sum because it was the lowest sum that we could persuade the *Duncan* plaintiffs' counsel to accept to dismiss their suit." *Id.* ¶ 130. It "was not intended to compensate plaintiffs, and did not compensate plaintiffs, for any alleged underpayment by Komatsu for their shares of Joy stock." *Id.* As Prof. Steven Solomon has observed, the amount of the *Duncan* settlement is not

what commentators knowledgeable about M&A transactions would recognize as a "bump-up" payment, given the $3.7 billion value of the Joy sale compared with the $20 million settlement sum (approximately 15¢ per share, after costs and fees). *Id.* ¶ 132.

## V. CNA's Misleading Characterizations of the Joy Witnesses' Testimony.

Faced with the evidence above, CNA takes several liberties with the testimony of Joy's witnesses in an effort to suggest they refute the notion that CNA breached its duty of good faith.

For example, despite CNA's contrary suggestion, Mr. Bailey did not bless CNA's course of conduct in this case as reasonable during his deposition. *See* CNA's Bad Faith Br. (Dkt. 98-0), at 4. He simply said "no" when CNA asked whether its representatives did anything "as Joy Global was deciding whether *to give a notice of circumstance*" under the expiring 2015–16 policy "that you considered to be misleading or inappropriate." PRSOF ¶ 84 (emphasis added). Further, the core issue presented by Joy's bad faith claim is CNA's *claims-handling conduct* under the 2016–17 CNA Policy *after and in light of* its statements and conduct during the underwriting of that Policy. The record shows that Mr. Bailey's involvement was mainly in connection with underwriting and did not extend substantially beyond his initial review of the complaints in the Securities Actions in August 2016. PPSOF ¶ 70.

CNA's other quotations of Mr. Bailey are equally unavailing. *See* CNA's Bad Faith Br. at 4–5, 12. For example, in stating that the "bump-up" exclusion is not "limited by a specific cause of action," Mr. Bailey expressly cautioned that he was not referring to the CNA Policy language at issue; indeed, both his testimony and his contemporaneous emails *expressly agree* with the point that the "bump-up" exclusion addresses a *type of liability*—purely price-based claims, *not* "disclosure claims" of the sort presented in the Securities Actions. PRSOF ¶ 79; *see also* PPSOF ¶¶ 72–76.

CNA also badly misconstrues the testimony and opinions of Ms. Longmore. *Compare* CNA's Bad Faith Br. at 5, 12 *with* PRSOF ¶¶ 130–131. While Ms. Longmore testified that "[t]here are claims that could have come in that would have fit within [the 'bump-up' exclusion] wording," she stated in the very next breath (which CNA neglects to mention) that "*it's just that the claims that came in did not fit within that wording*." PRSOF ¶ 130. Her opinions, as stated in her reports, remain unchanged: In sum, "a reasonable D&O insurer, acting in good faith on the record of this case, would readily conclude that an application of the bump-up exclusion in Joy Global's policies to Joy Global's insurance claim here would be inconsistent with the prevailing and recognized understanding in the D&O insurance field of the language, purpose, and scope of the bump-up exclusion, as adopted by CNA." PRSOF ¶¶ (citing Longmore Opp. Decl. ¶ 6). Joy's Senior Risk and Compliance Manager, Mr. Phung "was genuinely shocked and surprised to learn in 2019 that CNA had denied coverage for all of the liabilities that Joy ultimately incurred to settle the Securities Actions," and he disagrees with CNA's suggestion that it "did nothing to mislead Joy." PPAF ¶¶ 25, 34.

## LEGAL STANDARDS

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party and may grant the motion only if *no reasonable jury* could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). CNA faces a particularly high hurdle to obtain summary judgment here, because "bad faith" requires a fact-intensive inquiry that ordinarily should be left to the trier of fact.

*Wisconsin law broadly recognizes a cause of action for "bad faith" to protect insureds from unfair and unreasonable insurer conduct.* Wisconsin law has long recognized that an insurer

owes "a special duty" to its insured, imposed by law and flowing from the "duty of good faith and fair dealing" in every insurance contract. *See Jones v. Secura Ins. Co.*, 249 Wis. 2d 623, 631 (Wis. 2002) (citing *Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675 (Wis. 1978)). An insurer's breach of this special duty constitutes the "tort of bad faith." *Anderson*, 85 Wis. 2d at 686. "The Wisconsin Supreme Court first allowed a cause of action for bad faith in 1916 and fully recognized the tort of bad faith in 1931. Thereafter, Wisconsin law has continued to develop the tort." *Roehl Transp., Inc. v. Liberty Mut. Ins. Co.*, 325 Wis. 2d 56, 75 (Wis. 2010). Wisconsin cases do not "purport to catalogue all possible bad faith claims;" rather, "bad faith" is an inherently fact-bound issue. *Id.*

An insurer's exposure to liability for "bad faith" restrains unfair and unreasonable treatment of its insured. "An insurance company owes a duty to its insured to settle or compromise a claim made against the insured and to act in good faith in doing so" (*Roehl Transp.*, 325 Wis. 2d at 760), and "when the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort" (*Anderson*, 85 Wis. 2d at 689). Absent such liability, an insurer could deny coverage reasonably owed and *profit from doing so*, as its insured might only incur further losses in an effort to hold its insurer to account for the parties' bargain.[4]

"[F]or an insurance company's decision on a claim to be one made in good faith, it must be based upon a knowledge of the facts and circumstances upon which liability is predicated." *Anderson*, 85 Wis. 2d at 688. "The lack of reasonable diligence and the insurer's refusal to determine the nature and extent of the liability evidence[s] bad faith." *Id.* Likewise, "the knowing failure to exercise an honest and informed judgment constitutes the tort of bad faith." *Id.* at 692.

---

[4] An insurer who engages in bad faith without exposure may calculate that its insured will settle for less than the insurer owes, and that the difference between what it pays and what it owes will be greater than its litigation costs.

*A claim of "bad faith" requires a fact-intensive inquiry that ordinarily must be resolved by the trier of fact.* Under law, an insurer is liable for "bad faith" where (1) "there is no reasonable basis for the insurer to deny the insured's claim for benefits under the policy," and (2) "the insurer knew of or recklessly disregarded the lack of a reasonable basis to deny the claim." *Brethorst*, 334 Wis. 2d at 46. The first prong is objective in nature; the second is subjective in nature; and both are fact-intensive. *Id.* at 38.

Under the first prong, "the trier of fact measures the insurer's conduct against what a reasonable insurer would have done under the particular facts and circumstances to conduct a fair and neutral evaluation of the claim." *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 378 (Wis. 1995). "In applying this test, it is appropriate for the trier of fact to determine whether the insurer properly investigated the claim and whether the results of the investigation were subjected to reasonable evaluation and review." *Id.* Inherent in this test is the idea that there must be "*some breach of contract by an insurer*" (*Brethorst*, 334 Wis. 2d at 52 (emphasis added)), and coverage is not "fairly debatable" (*Danner v. Auto-Owners Ins.*, 245 Wis. 2d 49, 78–82 (Wis. 2001)).

Under the second prong, the trier of fact must determine whether the insurer had the requisite subjective knowledge, or reckless disregard, to render the insurer liable in bad faith. *See Brethorst*, 334 Wis. 2d at 46; *Weiss*, 197 Wis. 2d at 392. This subjective component "can be inferred from a reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured." *Brethorst*, 334 Wis. 2d at 38.

As Wisconsin's pattern jury instructions frame the ultimate issue: "Bad faith on the part of an insurance company towards its insured is the absence of honest, intelligent action or consideration of its insured's claim. Bad faith exists if, upon an examination of the facts found by you, you are able to conclude that [insurer] had no reasonable basis for denying [insured]'s

claim. . . . [Y]ou may infer from [the insurer's failure to properly investigate or reasonably evaluate and review the insured's claim] a reckless disregard on the insurance company's part to learn that there was no reasonable basis for it to deny [insured]'s claim." *Brethorst*, 334 Wis. 2d at 41.

Given the fact-intensive nature of the "bad faith" inquiry under Wisconsin law, courts commonly commit the issue to the trier of fact so long as there exists some credible evidence that the insurer acted without a reasonable basis to deny coverage. *See, e.g.*, *Danner*, 245 Wis. 2d at 77–82. Further, while not required, expert testimony is often appropriate to aid the trier of fact in evaluating the insurer's conduct in relation to what a reasonable insurer would have done under the circumstances. *See Weiss*, 197 Wis. 2d at 381–82. As always, the evidence must be viewed as a whole and, at this stage, in the light most favorable to Joy. *See Wis. Local Gov. Prop. Ins. Fund v. Lexington Ins. Co.*, 2017 WL 4998158, at *12 (E.D. Wis. Oct. 31, 2017) ("While [the insurer] attempts to pick apart various aspects of the [insured's] bad faith evidence, that evidence viewed holistically raises disputes of fact which require a jury's intervention.").

## ARGUMENT

The record is replete with evidence from which a rational juror could find that CNA (1) lacked a reasonable basis for denying Joy's coverage claim and (2) knew as much.

## I. A Rational Juror Can Conclude That CNA Lacked A Reasonable Basis For Determining That No "Part Of" Joy's Loss Is Entitled To Coverage.

The record soundly supports a finding that CNA defied "what a reasonable insurer would have done under the particular facts and circumstances to conduct a fair and neutral evaluation of the claim." *Weiss*, 197 Wis. 2d at 378. To prove otherwise, CNA must show that it is "fairly debatable" that its Policy covers *none* of Joy's loss—i.e., *no "part of"* Joy's $20.8 million in settlement payments to resolve the eight Securities Actions, *as those suits were pleaded*. CNA must sustain this burden in a legal landscape where policy exclusions are read narrowly and where

CNA bears the burden of proving that 100% of the sum at issue falls within the scope of the "bump-up" exclusion, and in circumstances where:

- CNA underwrote and sold the Policy specifically to protect Joy from shareholder claims arising from Joy's announced sale to Komatsu (*see* Facts, Part I, *supra*; JCB at 7–9);

- the widely understood history, purpose, and scope of the exclusion make clear that it applies to a discrete type of liability and moral hazard not presented here (*see* JCB at 24–26; JCOB at 20–24);

- CNA had a duty under the Policy's allocation provision to "exert . . . best efforts," in cooperation with its insured, to cover any "part of" Joy's loss that it could not unambiguously prove to be excluded from coverage (*see* JCOB at 2–3, 26–30; PPAF ¶ 1)

- the undisputed evidence shows that no "part of" Joy's settlement payments was a "bump-up" payment (*see* JCOB at 7, 26–30); and

- CNA expressly acknowledged that the *Duncan* suit, as pleaded, might warrant coverage, but then (in violation of the Policy and Wisconsin law) demanded that Joy prove the *inapplicability* of CNA's "bump-up" exclusion to all parts of Joy's indemnity claim (*see* Facts, Part III, *supra*).

CNA has not borne, and cannot bear, this burden.

**A.     CNA's Blanket Denial of All Indemnity Coverage Rests on an Unreasonable Reading of the Pleadings and Contradicts the CNA Policy's Plain Language.**

As Joy has explained in its briefs addressing its indemnity coverage claims, no "part of" Joy's three settlements in the Securities Actions is excluded from coverage under the plain language of the "bump-up" exclusion. *See* JCB at 17–28 JCOB at 14–26.

All eight Securities Actions alleged that by failing to disclose material information in proxy statements or making materially misleading statements therein, Joy and its directors and officers misled Joy's shareholders and deprived them of their rights to make informed decisions about whether to approve the company's sale to Komatsu (PPSOF ¶¶ 67–68, 90; JCB at 20–23; JCOB

15–20). These are misrepresentation (or in the words of Dan Bailey, "disclosure") claims, not price-based claims like appraisal or freeze-out claims. To be specific:

- The *Duncan* Amended Complaint solely asserted claims for violations of the federal Proxy Fraud Rules. PPSOF ¶ 88. It asserted that Joy's sale never should have happened and demanded a declaration that Joy's proxy statement was misleading, "compensatory *and/or* rescissory damages," plaintiffs' attorney fees, costs, and interest. *Id.* ¶¶ 89–90.

- The complaints in the other seven Securities Actions all alleged the same or materially similar legal claims and sought to prevent the sale from happening *at all*. PPSOF ¶¶ 66–68.

The plaintiffs' claims, as pleaded in all eight cases, control: they state the legal bases on which the Securities Actions alleged that Joy was liable, and it was on the basis of such alleged liability, as pleaded in these complaints, that Joy settled the actions and paid the settlement amounts at issue. In its attempt to recast the Securities Actions as something they are not, CNA reaches beyond the legal claims pleaded in the underlying complaints to divine what it says is the purported "premise" or "motivation" of the lawsuits. *See* CNA's Bad Faith Br. at 6–7; Insurers' Coverage Brief ("ICB," Dkt. 97-0) at 15–17. But one does not look *beyond* the language of a plaintiff's pleaded claims to decide what she is claiming and to determine whether the CNA Policy's "bump-up" exclusion operates. *See* JCB at 26–28; JCOB at 15–19. Further, CNA's assertion that "inadequate consideration" constitutes an "essential allegation" of the *Duncan* plaintiffs' Proxy Fraud Claims is false and foreclosed by clear Supreme Court authority to the contrary. *Compare* ICB at 15–16, *with* JCOB at 16–19.

The unreasonableness of CNA's coverage position is also evident in the unpersuasive and inconsistent justifications it offers for its coverage denial. CNA argues (contrary to a reasonable reading of the exclusion in accordance with its commonly understood history, purpose, and scope) that the "bump-up" exclusion "does not turn on the *cause of action or legal theory* asserted against

the Insured" (i.e., the alleged basis of liability). ICB at 16. In so arguing, however, CNA omits from its discussion of the Policy's definition of "Claim" the words that disprove its position: a "Claim" is not any "civil . . . proceeding," but one "*alleging a Wrongful Act*" (i.e., where the alleged *wrongful act* complained of is underpricing). *See* JCOB at 19–20. Likewise, while CNA argues that the exclusion turns upon "an allegation of the *harm suffered* or *damages sought*," it simultaneously argues that the Duncan plaintiffs' prayer for "rescissory damages" and "reasonable attorneys' fees, expert fees and costs" (PPSOF ¶ 89) must be ignored and are somehow *not* a covered "part of" the alleged "harm suffered or damages sought." *See* ICB at 17, 21–23; *see also* JCOB at 18, 26–30. Such "heads I win, tails you lose" logic is not reasonable.

Nor does the sole "bump-up" case that CNA cites—*Onyx Pharmaceuticals*, No. CIV 538248 (Cal. Super Ct. Oct. 1, 2020) (Howell Decl. Ex. 24)—render CNA's coverage position "fairly debatable." *See* CNA's Bad Faith Br. at 13. As Joy has explained, *Onyx* is readily distinguishable, an outlier in the case law, and an unpublished "proposed" ruling by a California state court that has no precedential value even in California. *See* JCOB at 22. It is also facially unpersuasive, at least if and as applied to the present record. *Id.*

A further concern is that CNA's selective and misleading characterizations of the testimony of Joy's witnesses fails to appreciate that a trier of fact may reasonably credit, in Joy's favor, an accurate understanding of that testimony. *See* Facts, Part V, *supra*. For example, any fair reading of Ms. Longmore's testimony reveals that, in her opinion, "CNA's statements and actions in the course of handling Joy Global's insurance claim for the Duncan settlement . . . is not reasonable claims handling conduct or consistent with minimally acceptable industry standards for fair claims handling." PPAF ¶ 35 (e.g., Longmore Rpt. ¶¶ 6(b), 104–120); *see also id.* ¶ 28 (Longmore Rpt. ¶¶ 6(a), 85–103); ; PRSOF ¶¶ 130–131 (e.g., Longmore Opp. Decl., ¶¶ 4–6) (pointing out CNA's

mischaracterizations of her deposition testimony and opinions). Similarly, while CNA selectively quotes Mr. Bailey (whom CNA touts as "a prominent attorney who wrote what is generally considered to be the leading treatise on D&O liability and insurance" (CNA's Bad Faith Br. at 3), throughout its papers, CNA ignores both:

- the contemporaneous impressions that Mr. Bailey provided upon reviewing the complaints in the Securities Actions in 2016, *before* Defendants (who are also his clients) denied coverage, when he observed that: (a) "I do not see anything in the [*Oduntan*] complaint that gives me pause" or "foresee any coverage defense really applying here," and (b) the Securities Actions allege "disclosure claims," *not* claims predicated on allegations that "the price was inadequate" (PPSOF ¶¶ 71–74);[5] and

- his bottom-line, sworn conclusion in this case—namely, that the claims pleaded in the Securities Actions "are not state-law breach of fiduciary duty claims of the sort that policyholders were experiencing, and *that insurers were envisioning, when the bump-up exclusion at issue in this case was developed*" *Id.* ¶ 76 (citing Bailey Decl. ¶ 33).

By any fair reading of these facts, the record raises a triable issue over whether CNA had a reasonable basis to deny Joy's claim.

**B.  Joy's Settlements Included No "Bump-Up" Payments, and Nearly One-Third of Joy's Payments Did Not Go into Any Plaintiffs' Pockets.**

As Joy has shown, no "part of" any of the settlement payments was a "bump-up" payment. JCOB at 7, 14–26. But for purposes of the present motion, it is particularly notable that CNA has no convincing explanation for why the sums that indisputably did not go into any plaintiffs' pockets can reasonably be considered "bump-up" payments (i.e., payments for plaintiffs' allegations of "inadequate consideration"). These sums include $5 million paid to the *Duncan* plaintiffs' *attorneys*; $███ paid to the plaintiffs' *attorneys* in the other seven cases (i.e., the *only* sums Joy paid in those cases); and about $600,000 in *Duncan* case administrative costs—a

---

[5] The claims alleged in *Oduntan* and in the *Duncan* Amended Complaint are identical. PPSOF ¶ 75.

combined sum of approximately $6.4 million, 31% of the total loss at issue (before interest). PPSOF ¶¶ 77–79, 137, 139.

CNA justifies its refusal to cover even these amounts by arguing that all of the plaintiffs' claims are "bump-up" claims, and thus, any and all amounts paid to settle those claims are, necessarily, "bump-up" payments within the exclusion. CNA's Bad Faith Br. at 10–11. CNA further argues that, because the *Duncan* settlement resulted in a "common fund" from which all the attorney fees and other costs were then paid, the full *Duncan* settlement is excluded from coverage, and no segregation among the different components of the settlement is appropriate. ICB at 23–26. Both arguments are unreasonable, and neither withstands scrutiny.

*First*, by its terms, the "bump-up" exclusion is a *partial* exclusion: it withdraws coverage only for any "amount" of any "settlement" of "*that part of* any Claim alleging that the price or consideration paid or proposed to be paid for the acquisition . . . of an entity is inadequate." PPSOF ¶¶ 24–25 (defining "Loss" and "Inadequate Consideration Claim") (emphasis added). In addition, both the Policy and Wisconsin law impose a duty on CNA to recognize a good faith allocation between covered and uncovered parts of loss. JCOB at 2–3, 12, 27–28. To suggest that different components of Joy's loss are not entitled to different treatment, or that no segregation of the facially discrete components of the *Duncan* settlement is appropriate, flies in the face of the Policy, Wisconsin law, and the self-evident facts.

*Second*, it elevates form over substance to suggest that Joy has no coverage for plaintiffs' attorney fees because those fees were paid out of a "common settlement fund." By that logic, coverage could exist if Joy paid the same fees to plaintiffs' attorneys directly. The first "bump-up" case ever decided recognized this point. *See Safeway Stores, Inc. v. National Union Fire Ins. Co.*, 64 F.3d 1282, 1287 (9th Cir. 1995) (holding that Safeway's settlement was not covered "loss," but

the part of the settlement for plaintiff attorneys' fees *was* covered: "[t]he lawyers got the money, not the shareholders"); *see also UnitedHealth Group Inc. v. Hiscox Dedicated Corp.*, 2010 WL 550991, at *10 (D. Minn. Feb. 9 2010) (holding that "it is irrelevant that [the insured] will not be required to cut a separate check to the . . . plaintiffs' attorneys," as it makes no difference for coverage whether such fees are paid directly or from a common settlement fund). Further, there was *no* common fund in the non-*Duncan* settlements; the full amount of those settlements ($▮▮▮▮▮) was *paid exclusively* for plaintiffs' fees. PPSOF ¶¶ 77–79.

### C. CNA Ignores How a Reasonable Insurer Would Act Given the Commonly Understood History, Purpose, and Scope of the "Bump-Up" Exclusion.

Expert evidence about the commonly understood history, purpose, and scope the D&O insurance industry's "bump-up" exclusion further shows that CNA has not acted as a reasonable insurer. *See Weiss*, 197 Wis. 2d at 381–82 (noting that expert testimony can be helpful to the trier of fact in assessing whether an insurer has been reasonable).

Ann Longmore has spent 30 years in the D&O insurance field working for market-leading D&O insurers and brokers. As she explains, for reasons detailed in her initial report, "[t]he purpose and intended meaning of the 'bump-up' exclusion is not to exclude coverage for claims asserted against a target company or its directors and officers under the federal securities laws, like those asserted and settled in the *Duncan* suit." PPAF ¶ 8; *see also id.* at ¶ 41 ("I do not consider this question, or Joy Global's entitlement to coverage, fairly debatable under the circumstances, given CNA's knowledge, statements, and actions.").

Professor Steven Davidoff Solomon is a leading scholar and nationally recognized expert on the federal securities laws, public company mergers and acquisitions, and related shareholder litigation. As he explains in his first report, "federal securities law commentators, M&A practitioners, and informed public companies that buy D&O insurance—as a matter of custom and

practice and commonly shared and prevailing understandings—would not expect the 'bump-up' exclusion in the Policies to apply to . . . the *Duncan* lawsuit and settlement." PPAF ¶ 33.

The opinions of Ms. Longmore and Prof. Solomon are not seriously or credibly controverted by any admissible testimony proffered by CNA. In fact, CNA has cited no expert evidence in support of its motion, and the expert that CNA proffered during discovery to rebut the opinions of Ms. Longmore and Prof. Solomon, and to attest to the reasonableness of CNA's handling of Joy's claim, presented no competent, admissible testimony. CNA's proffered expert, Charles Ehrlich, has never worked for an insurance company that has underwritten and sold D&O insurance policies; has never served as a D&O underwriter or broker; has supervised, but has not directly handled, *any* insurance claims and cannot recall ever supervising the handling of a D&O claim; has not worked extensively with the "bump-up" exclusion and cannot recall when the exclusion has ever come up in his past work; and has experience with purchasing D&O policies, but only for private companies—not for any public companies (like Joy), which have exposure to the federal securities laws regulating the purchase and sale of publicly traded stock and are the only policyholders relevant to the D&O policies, shareholder class action claims, and issues presented in this case. PPAF ¶¶ 46–49; *see also id.*¶ 42–45 (addressing the testimony of Greg Flood, an expert proffered during discovery by all three Insurers on the issues of coverage, not bad faith).

### D. CNA Sold Insurance Coverage to Joy Specifically for Shareholder Claims Arising Out of the Komatsu Transaction.

CNA's conduct did not occur in a vacuum. It underwrote its Policy against the backdrop of Joy's announced sale and an expectation of related shareholder lawsuits, and there is now a rich record of documents and testimony that show what the parties thought, said, and did—both at the time of underwriting, and subsequently, as the anticipated lawsuits rolled in and CNA considered

and denied Joy's insurance claim. In the face of this record, CNA's assertion that it did not mislead and mistreat Joy presents a classic "genuine issue of material fact." *See* CNA's Bad Faith Br. at 14–15. Indeed, Joy's contrary claim is amply supported by fact witness testimony, expert evidence, and dozens of documents in respect to which a rational fact-finder can find in its favor. PPSOF ¶¶ 91–101; PPAF ¶¶ 13–28; Facts, Part I, *supra*.

Nor is it a defense for CNA to assert that it lacked any "obligat[ion] to provide Joy Global with advice concerning the potential for coverage." CNA's Bad Faith Br. at 14. The issue is not whether CNA had an *ex ante* obligation to advise Joy about coverage—although, as Ms. Longmore explains, Joy's report of the announced sale to CNA "put the onus on CNA to explain whether, and if so how, this news would affect the renewal." PPAF ¶ 14. Rather, the issue is whether CNA *engaged in affirmative misconduct*, either by (a) inducing Joy to believe that it was buying coverage for shareholder claims like the Securities Actions that CNA then unreasonably refused to honor (or perhaps, had no intention of honoring) or (b) unreasonably handling Joy's claim and unreasonably denying *all* indemnity coverage for the claim, through an overly broad view of the "bump-up" exclusion that contradicts the language and commonly accepted understanding of the history, purpose, and scope of this standard D&O policy provision.

In this connection, CNA's reliance on *Van Den Heuvel v. AI Credit Corp.*, 951 F. Supp. 2d 1064 (E.D. Wis. 2013), and *Go Wireless, LLC v. Md. Cas. Co.*, 2013 WI App 41 (Wis. Ct. App. 2013), is misplaced. Neither involved a claim of "bad faith" for an unreasonable denial of insurance coverage. *Van Den Heuvel* considered whether advertising materials provided by insurance "intermediaries" misrepresented the potential performance of a life insurance contract *as an investment vehicle*, where the investor had signed a contract "acknowledging they were entering into the premium financing agreement at their own risk." 951 F. Supp. at 1068–69, 75.

The court ruled that the "intermediaries" were "not agents" of the insurers and thus lacked any duty to disclose information as a matter of law, and even if they were agents, plaintiff's vague citations to various Wisconsin laws and regulations governing insurance companies failed to support a "duty of disclosure." *Id.* at 1080–81. Here, by contrast, there is no dispute that Wisconsin law imposes on CNA a duty of "good faith" as Joy's insurer; the question is whether CNA acted reasonably *as a matter of fact* in light of that duty and the circumstances of this case.

*Go Wireless LLC* involved an insured which contacted its insurer's customer service center and asked the insurer to remove certain insured locations from its business property coverage policy. 2013 WI App. at ¶ 5–7. The insured claimed that by answering its call through a service center and making the changes it had requested, the insurer thereby owed a "duty to advise" about the effect of the changes on the insured's coverage. *Id.* ¶ 37. The court held that the insured had failed to show the "special circumstances" needed to impose a "duty to advise" on an insurance agent under Wisconsin Law. *Id.* ¶¶ 40–44. The case offers no support for the notion that an insurer, like CNA here, can affirmatively mislead its insured, or unreasonably deny coverage, with impunity, and the "special duty" of good faith under Wisconsin law plainly requires otherwise.

CNA's contention that Joy received the coverage that CNA led Joy to expect—in part, because CNA ultimately paid more than $2 million in *defense costs* coverage—misses the point. CNA's Bad Faith Br. at 14. It assumes away the disputed factual question. It is also facially implausible, as public companies do not buy D&O policies to cover defense costs alone and, as CNA told Joy, its concern was to avoid having "two limits exposed." Given that each limit was for $10 million excess of a $1.5 million self-insured retention, it strains credibility for CNA to suggest it was only thinking about defense costs. *See* PPSOF ¶¶ 42, PPAF ¶¶ 15. In fact, CNA's underwriter, Mr. Lim, has testified that his "concern was *not* just about defense cost exposure."

PPAF ¶ 18 (emphasis added). And CNA considered offering Joy high-level excess coverage, on the basis that, "[a]ssuming the merger obj[ection] claim *doesn't become some record breaking claim*, we'll still sit excess $90M'ish." PPSOF ¶ 56 (emphasis added). Certainly, Joy did not think that the coverage it had purchased was limited to defense costs in this context. PPAF ¶ 23.[6]

On this record, as Ms. Longmore has observed, "[a] reasonable policy holder would believe that it purchased the CNA Policy precisely for shareholder claims arising from the Komatsu transaction." PPAF ¶ 26. And a rational juror could so conclude.

### E.    CNA Failed to Conduct a Fair and Neutral Evaluation of Joy's Claim

The fact that CNA acted unreasonably in denying coverage for any part of Joy's indemnity claim is further evidenced by CNA's self-serving claim evaluation. *See* Facts, Part III, *supra.*

For example, a rational juror could agree with and credit Ms. Longmore, whose exhaustive review of the evidence led her to conclude: "CNA's statements and actions in the course of handling Joy Global's insurance claim for the *Duncan* settlement . . . is not reasonable claims-handling conduct or consistent with minimally acceptable industry standards for fair claims handling." PPAF ¶ 28 (e.g., Longmore Rpt. ¶¶ 94–103). As Ms. Longmore elaborated in her deposition, CNA's denial of coverage, followed by an acknowledgement of the possibility of coverage, followed again by a denial of coverage—all based on the very same underlying pleadings—is "virtually unheard of" and "unparalleled," and is something she has "never seen before in my decades of experience in the world of D&O." *Id.* ¶ 36.

A rational juror further could conclude that CNA's coverage denial was driven not by a fair and neutral evaluation of the Joy's claim for coverage, but by CNA's growing alarm about

---

[6] The fact that CNA ultimately paid more than $2 million in defense costs cannot mitigate the unreasonable breach of its wholly separate promise of indemnity coverage. Further, CNA's breach of its defense costs obligation was also a claim in this case, until the parties settled it.

whether "we should be reconsidering the merger objection language we use as well as what language we will agree to follow" in light of "what we are experiencing with Joy Global," and its realization that "[w]e will likely need to address this." PPAF ¶¶ 37–40. Indeed, on the basis of the record viewed as whole, a jury would be fully justified in finding, as did Ms. Longmore, that "CNA's statements and conduct in this matter have been unreasonable and oppressive to its insured." PPAF ¶ 41.

## II.    A Rational Juror Can Conclude that CNA Knew, or Recklessly Disregarded, the Absence of a Reasonable Basis to Deny All Indemnity Coverage

The second prong of the "bad faith" inquiry focuses on whether "the insurer knew of or recklessly disregarded the lack of a reasonable basis to deny the claim." *Brethorst*, 334 Wis. 2d at 46. By its nature, this *subjective* inquiry concerns CNA's state of mind; it implicates issues of credibility and motivation; and it is best suited for, and appropriately resolved by, a trier of fact, particularly under the circumstances of this case. *See Anderson*, 85 Wis. 2d at 692 ("[B]ad faith is the absence of honest, intelligent action or consideration based upon a knowledge of the facts and circumstances upon which a decision in respect to liability is predicated."); *id.* at 693 (bad faith may be "imputed" from "a reckless indifference to facts or to proofs submitted by the insured").

Further, many of the facts and considerations addressed above and in Joy's coverage briefs, which establish that CNA lacked a reasonable basis for denying Joy's claim, *equally* show that CNA knew and/or recklessly disregarded the absence of a reasonable basis for its blanket refusal to accept coverage for any "part of" Joy's claim. Again, the categorical nature of CNA's coverage denial is telling in this regard. In fact, given the advanced age of Joy's claim, the duration of this litigation, and everything that Joy has shown by this point in support of its claim, Joy submits that CNA can no longer reasonably contend that it does not *know*, or has not *recklessly disregarded*, that Joy has rights to at least some indemnity coverage.

To summarize some of the most material facts:

- CNA unquestionably knew of, and expressly brought to Joy's attention, the "material change in risk" of shareholder claims posed by Joy's announced sale (PPSOF ¶¶ 37, 40–41);

- CNA unquestionably knew when it underwrote the Policy that at least seven plaintiff law firms were "trolling" for shareholder claims to file in connection with Joy's announced sale, and it underwrote and sold the Policy specifically to protect Joy from such claims (PPSOF ¶¶ 40, 49; Facts, Part I, *supra*);

- CNA certainly knows, and has recklessly disregarded, that a reasonable interpretation of the "bump-up" exclusion cannot support the conclusion that it _unambiguously_ applies to _100%_ of Joy's claim, (JCB at 16–30; JCOB at 12–30);

- indeed, CNA knows, and has recklessly disregarded, that the undisputed evidence establishes that _no_ "part of" Joy's settlement payments was a "bump-up" payment (JCOB at 7, 26–27);

- CNA certainly knows, and has recklessly disregarded, the commonly accepted understanding of the history, purpose, and scope of the exclusion, which make clear that it applies to a type of claim and liability not presented here (JCB at 24–26; JCOB at 20–22);

- CNA knows, and has recklessly disregarded, its duty under the Policy's allocation provision to "exert . . . best efforts," in cooperation with Joy, to cover any "part of" Joy's loss that is not unambiguously excluded from coverage[7] (PPAF ¶ 1; JCOB at 2–3, 27–30); and, perhaps most tellingly,

- CNA has expressly acknowledged that the *Duncan* suit, *as pleaded*, might warrant coverage, but it has knowingly, recklessly, and wrongly demanded that Joy prove the *inapplicability* of the "bump-up" exclusion to all parts of Joy's claim by reference to some information beyond what the *Duncan* plaintiffs themselves have alleged (Facts, Part III, *supra*; JCOB at 6, 17–18).

This evidence more than suffices to defeat CNA's motion under Wisconsin law.

---

[7] Under Wisconsin law, a "best efforts" obligation, by itself, imposes a duty of "good faith." *See Metro. Ventures, LLC v. GEA Assocs.*, 291 Wis. 2d 393, 414–15 (2006) ("when a contract requires that a party use its 'best efforts' to fulfill its contractual obligations, the notion of 'best efforts' incorporates the concept of good faith").

**III.    Joy Suffered Damages As a Result of CNA's Bad Faith Conduct.**

Finally, despite CNA's contrary one-sentence assertion (*see* CNA's Bad Faith Br. at 18), Joy has suffered recoverable damages as a result of CNA's breach of its duty of good faith. An insurer is "liable for any damages which are the proximate result of the insurer's bad faith." *Jones*, 249 Wis. 2d at 645–46. Without limitation, such damages "may include damages that could also be recoverable independently in a breach of contract action" (*Jones*, 249 Wis. 2d at 646); "attorney fees and costs in bringing [the] bad faith action" (*Roehl Transp.*, 325 Wis. 2d at 115); and "punitive or exemplary damages" (*see Anderson*, 85 Wis. 2d at 686).

Here, Joy has suffered, for more than three years, a loss of the timely indemnity coverage to which it was entitled, and it has been forced to incur substantial legal and other costs to pursue its coverage rights and its bad faith claim. Wisconsin law entitles Joy to be made whole for these and any other losses that it may prove in a trial of its bad faith claim.

## CONCLUSION

For these reasons, Joy respectfully submits that the Court should deny CNA's motion.

Dated: January 22, 2021                    **COVINGTON & BURLING LLP**


                                           By: s/ R. Gregory Rubio
                                           Allan B. Moore
                                           R. Gregory Rubio
                                           Covington & Burling LLP
                                           One City Center
                                           850 10th Street, NW
                                           Washington, DC 20001
                                           T: (202) 662-6000
                                           F: (202) 778-5575
                                           abmoore@cov.com
                                           grubio@cov.com


                                           **MICHAEL BEST & FRIEDRICH LLP**

                                           Daniel J. Vaccaro, SBN 1018037
                                           Patricia L. Jenness, SBN 1082658
                                           Michael Best & Friedrich LLP
                                           790 N Water Street, Suite 2500
                                           Milwaukee, WI 53202
                                           T: (414) 271-6560
                                           F: (414) 277-0656
                                           djvaccaro@michaelbest.com
                                           pljenness@michaelbest.com

                                           *Attorneys for Plaintiff Joy Global Inc.*
                                           *(n/k/a Komatsu Mining Corp.)*

31